is greater by fifteen percent than the amount of the award, . . . the court may in its discretion award to the condemnee a reasonable sum for the fees of his or her attorney and for fees necessarily incurred for not more than two expert witnesses.

The court awarded such fees, and we find no abuse of discretion.

The district court also awarded "costs" to Pinnacle. From the court's order, we read "costs" to include the deposition expenses for $1,419.50. We have treated such expenses as costs in the past.[35] Unlike interest and fees, however, the eminent domain statutes do not expressly allow the court to award costs when the condemnee appeals the appraisers' award and obtains a greater amount from the jury. Nevertheless, the court's award of costs was proper under our case law.[36]

## CONCLUSION

We conclude that the court's January 2012 order was a final order from which Pinnacle failed to timely appeal. We also conclude that the City's offer to confess judgment was invalid and that the court's award of interest, fees, expenses, and costs was proper.

AFFIRMED.

---

[35] See, e.g., *Bunnell v. Burlington Northern RR. Co.*, 247 Neb. 743, 530 N.W.2d 230 (1995).

[36] *Keller v. State*, 184 Neb. 853, 172 N.W.2d 782 (1969).

---

STATE OF NEBRASKA, APPELLEE, V.
ARMON M. DIXON, APPELLANT.
___ N.W.2d ___

Filed July 26, 2013.    No. S-12-525.

1. **Motions for Mistrial: Appeal and Error.** Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

2. **Identification Procedures: Due Process: Appeal and Error.** A trial court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.

3. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

4. \_\_\_\_: \_\_\_\_. An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

5. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

6. **Criminal Law: Trial.** The general rule is that a defendant who is on trial should be free from shackles unless they are necessary to prevent violence or escape.

7. **Motions for Mistrial: Proof.** A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. Instead, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

8. **Evidence: Appeal and Error.** An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence presented; such matters are for the finder of fact.

9. **Prior Convictions: Proof.** In a proceeding to enhance punishment because of prior convictions, the State has the burden of proving such prior convictions by a preponderance of the evidence.

10. **Sentences: Prior Convictions: Habitual Criminals: Proof.** In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings.

11. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

12. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

13. **Sentences.** It is within the discretion of the trial court to impose consecutive
rather than concurrent sentences for separate crimes.

Appeal from the District Court for Lancaster County: Jodi
Nelson, Judge. Affirmed.

Dennis R. Keefe, Lancaster County Public Defender, and
Shawn Elliott for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein
for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack,
and Miller-Lerman, JJ.

Stephan, J.

In April 2009, an armed man forced his way into the
apartment of J.K. and sexually assaulted her over a 10-hour
period. He then took her cell phone and left the apartment.
Armon Dixon was eventually arrested and charged in the
district court for Lancaster County with first degree sexual
assault, use of a weapon to commit a felony, and robbery. He
was convicted on all charges by a jury and subsequently was
determined to be a habitual criminal. Dixon was sentenced to
a total of 80 to 140 years in prison. He appeals.

## I. FACTS

J.K., a full-time student, lived in an apartment in Lincoln,
Nebraska, with her 3-year-old son. Around 8 p.m. on April
23, 2009, she went to a gas station for cigarettes. She
returned about 8:45 p.m. and went on the balcony of her
apartment to smoke. About 9 p.m., J.K. answered a knock
on the apartment door and a man forced his way into the
apartment. After they struggled for 2 to 3 minutes, the man
displayed a handgun. He threatened to kill her and her son if
they were not quiet. She took her son to his bedroom, and the
man followed her there.

The man then followed J.K. to her bedroom. By that time,
he was wearing a light brown homemade mask with holes cut
out for the eyes and the mouth. He forced her to remove her
clothes and then blindfolded her, using the tank top she had

been wearing. During the next 10 hours, the man sexually assaulted J.K. at least six times. Prior to the first assault, J.K. heard the sounds of a paper sack, a wrapper being opened, and a zipper being unzipped.

The man forced J.K. to clean herself after each assault. He also removed the bedding after each assault. J.K. was not blindfolded the entire time and at one point noticed that the man had a large black garbage bag. The man told her he had been watching her earlier that evening, and he again threatened to kill J.K. and her son if she reported his actions.

At one point, the man used a gray T-shirt to blindfold J.K. and threatened both her and her son with a kitchen knife. J.K. believed the man was wearing a condom each time there was sexual penetration. She testified she had no condoms in her apartment.

After one assault, the man lay next to J.K. on the bed and asked her personal questions about her family and whether she had a boyfriend, as he ran the knife up and down the side of her body. During this time, J.K. saw that the mask was pulled up over the man's head and she could see his face.

J.K. eventually could hear birds chirping outside, and she told the man her neighbors got up at 6 or 7 a.m. After assaulting her one final time, he made her use toilet bowl cleaner in the sink, bathtub, and toilet. He then blindfolded her and led her into her son's room. He then directed her to lie on the floor face down and count to 200 or 300 before getting up. Eventually, J.K. heard the front door open and close, the rustling of plastic sacks, and then another door close.

J.K. got up and locked the front door and then checked all the rooms and closets to make sure the man was gone. The man took her cell phone. After changing clothes and dressing her son, J.K. drove to her parents' home in a nearby town.

J.K.'s father called police, who directed her to go to a hospital for an examination. J.K. gave a telephonic statement to police the following day. She described her assailant as a black male with "kind of bushy" hair. She said he was "scruffy looking" and about 5 feet 11 inches or 6 feet tall. He was wearing jeans, a black hooded sweatshirt, and latex gloves. J.K. said she saw the man while they were face to face as they

struggled at the door. During that time, the kitchen light was on and there was light coming from the television. J.K. later identified Dixon as the assailant after viewing a photographic array compiled by the Lincoln Police Department.

The police investigation into the assault showed that Dixon's sister lived in the same apartment building as J.K. A red Oldsmobile, which was registered to Dixon's mother and sometimes driven by Dixon, was towed from the apartment complex parking lot the week of April 24, 2009. A white 2000 Cadillac which was registered to Dixon was found in the apartment complex parking lot on May 3. On May 12, police searched the sister's apartment. They found unused condoms in a black trash bag in a bedroom closet and in a plastic storage tub in the living room. Officers also found a bill addressed to Dixon at that address. Dixon's sister testified that he lived with her 4 or 5 days each week. She testified that she was ill and did not work on April 23 and 24. She saw Dixon around 11:30 p.m. on April 23, but did not see him on the morning of April 24.

In April 2009, Dixon had two jobs. He worked during the day at Concrete Industries and part time in the evenings at Snyder Industries. He had access to latex gloves at both jobs. Snyder Industries had a plant in Lincoln on North 63d Street and another on Fremont Street. Time records indicated that Dixon clocked in to work at the North 63d Street plant at 5:58 p.m. on April 23. He clocked out at 6:16 p.m. and clocked in at the plant on Fremont Street at 6:24 p.m. He was clocked out at 11 p.m. That punch at 11 p.m. was added by a supervisor at 8:32 a.m. the next day. Dixon's supervisor testified that if an employee had problems with the timeclock or forgot to clock out, the supervisor could manually override the system the next day. The supervisor testified that he authorized vacation for Dixon from April 27 to May 1 after Dixon called on April 23 and left a message that he had to be with his sister in Chicago, Illinois.

Records for a cell phone that belonged to Dixon showed that the phone was used to check voice mail at 8:16 p.m. on April 23, 2009. The cell tower the call went through indicates it was placed in the area of the Fremont Street plant. Another

call to voice mail was made from that phone number at 11:32 p.m. It went through a cell tower that had a coverage area encompassing the location of J.K.'s apartment. The next call made from the same phone was to check voice mail at 8:15 a.m. on April 24. A number of calls made between 10 and 11:15 a.m. on April 24 all went through the same cell tower near J.K.'s apartment. A record of text messages on the phone showed one at 9:13 p.m. on April 23 and one at 12:03 a.m. on April 24.

A gray T-shirt was collected by a nurse when J.K. went to the hospital on April 24, 2009. DNA from the T-shirt was determined to be from a "single-source male." Dixon was excluded as a possible contributor of the DNA on the T-shirt. DNA tests were also completed on fingernail scrapings obtained from J.K. Dixon was not excluded as a possible contributor of DNA found in those scrapings.

Dixon testified that in April 2009, he stayed at the apartment of either his girlfriend, his mother, or his sister. He stated that he did not work at Concrete Industries on April 23, but he did work at Snyder Industries, checking in at 5:58 p.m. and out at 11 p.m. He said he went to his sister's apartment after work. On Friday, April 24, he went to Snyder Industries to ask for vacation time, and his supervisor told Dixon he had failed to punch out the night before. Dixon denied going to J.K.'s apartment, assaulting her, or holding her captive.

The jury found Dixon guilty of first degree sexual assault, use of a weapon to commit a felony, and robbery. The court found him to be a habitual criminal. Dixon was sentenced to terms of imprisonment of 35 to 60 years for first degree sexual assault, 35 to 60 years for use of a weapon to commit a felony, and 10 to 20 years for robbery. All sentences were ordered to be served consecutively.

## II. ASSIGNMENTS OF ERROR

Dixon assigns, restated, that the district court erred in (1) failing to grant his motion for mistrial on the basis that prospective jurors may have seen him in visible restraints during voir dire; (2) failing to grant his motion for mistrial on the

basis that the State elicited testimony from a police officer that violated the court's order prohibiting the presentation of evidence under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2012); (3) failing to sustain his motion to suppress evidence of identification and in subsequently admitting said evidence; (4) failing to sustain his motion for a directed verdict at the conclusion of all evidence; (5) determining he was a habitual criminal when the State did not provide sufficient proof of the proffered prior convictions; (6) applying the penalty provision of Neb. Rev. Stat. § 29-2221(1)(a) (Reissue 2008) based upon a purported prior conviction for aiding and abetting first degree assault; and (7) imposing excessive sentences.

## III. STANDARD OF REVIEW

[1] Whether to grant a motion for mistrial is within the trial court's discretion, and this court will not disturb its ruling unless the court abused its discretion.[1]

[2] A trial court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.[2]

[3,4] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[4]

_____

[1] *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013); *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

[2] *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 158, 184 L. Ed. 2d 78.

[3] *State v. Erickson*, 281 Neb. 31, 793 N.W.2d 155 (2011).

[4] *State v. Watt*, 285 Neb. 647, ___ N.W.2d ___ (2013); *State v. Wills*, 285 Neb. 260, 826 N.W.2d 581 (2013).

## IV. ANALYSIS

### 1. Motions for Mistrial

[5] We first consider Dixon's argument that the district court erred in overruling his two motions for mistrial. The first motion was based on a contention that prospective jurors may have seen him wearing leg restraints during voir dire examination, and the second motion was based on the contention that the State elicited inadmissible testimony from a police officer. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.[5] As noted, we review an order overruling a motion for mistrial for abuse of discretion.[6]

#### (a) First Motion for Mistrial

During jury selection, Dixon's counsel moved for a mistrial on the ground that prospective jurors may have seen Dixon in leg restraints while he was seated at the counsel table. Counsel chose not to inquire of prospective jurors whether they had in fact seen the restraints. The prosecutor argued that prospective jurors could not have seen the restraints because a cart blocked their view, but Dixon disputed this. After personally assessing the prospective jurors' view of Dixon, the court overruled the motion but requested that transport officers remove the leg shackles and replace them with a leg brace.

[6] The general rule is that a defendant who is on trial should be free from shackles unless they are necessary to prevent violence or escape.[7]

> This is because it is central to the right to a fair trial, guaranteed by the 6th and 14th Amendments, that one accused of a crime is entitled to have his or her guilt or

---

[5] *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012).

[6] *State v. Watson, supra* note 1; *State v. Scott, supra* note 1.

[7] *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *abrogated on other grounds, State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009); *State v. Heathman*, 224 Neb. 19, 395 N.W.2d 538 (1986).

innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.[8]

But application of the general rule must be tempered with some measure of common sense. Jurors are aware that the defendant "did not arrive there by choice or happenstance."[9] It is not possible to "eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct."[10]

In *State v. Mata*,[11] it was undisputed that jurors observed the defendant in leg restraints as he walked 15 to 20 feet through the courtroom. But we held that the district court did not err in overruling his motion for mistrial, reasoning in part that "[t]he restraints could serve only to call the jury's attention to what it already knew—that [the defendant] was charged with a serious crime."[12] Viewing the proceedings in their entirety, we concluded that the defendant was not additionally stigmatized or deprived of a fair trial by the use of leg restraints.

Here, it is not clear from the record that any prospective juror ever actually saw Dixon in leg restraints. Moreover, when the issue was called to the trial judge's attention, she took immediate steps to ensure that jurors would not see the restraints. When Dixon testified, he was fitted with a leg brace so he could walk to the witness stand. When he completed his testimony, he remained seated in the witness stand until the jury left the courtroom. Considering the sparse factual record of the leg restraint incident in the context of the entire proceeding, we conclude that the district court did

---

[8] *State v. Mata, supra* note 7, 266 Neb. at 691, 668 N.W.2d at 471.

[9] *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

[10] *Id*.

[11] *State v. Mata, supra* note 7.

[12] *Id*. at 692, 668 N.W.2d at 472.

not abuse its discretion in overruling Dixon's first motion for mistrial.

### (b) Second Motion for Mistrial

Dixon argues that the trial court abused its discretion in overruling his motion for a mistrial based on the testimony of Sgt. Gregory H. Sorensen of the Lincoln Police Department. Sorensen compiled the photographic array from which J.K. identified Dixon as the perpetrator of the assaults. Prior to trial, the district court entered an order determining that evidence of another crime for which Dixon had been convicted in *State v. Dixon* (*Dixon I*)[13] was inadmissible in this case under § 27-404(1). On direct examination, Sorensen stated that he showed a series of photographs to J.K. on May 2, 2009. He stated that the individuals portrayed in the photographs were selected through "matching physical descriptions, possibly Crimestoppers, probably known sex offenders." Sorensen said police had no "clear cut suspect" at that time. He selected the photographs after he was "given names by other detectives in the criminal unit that were also working on the case. And they were names that they had come up with either — like I said, from people that were on parole for sex crimes, violent histories, information, people that matched physical description."

At that point, Dixon's counsel asked for a sidebar, in which he stated that Sorensen's testimony violated the court's pretrial rulings with respect to evidence of other crimes and that the testimony implied that Dixon was a convicted sex offender and on parole. Counsel moved for a mistrial or an attempt to clarify that Dixon was not a known sex offender. The court overruled the motion, reasoning that Sorensen had mentioned a number of different criteria used in selecting the photographs.

Dixon contends that the State was on notice Dixon's prior conviction was not admissible and that Sorensen's testimony was so fundamentally unfair that no admonition could have

---

[13] *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

removed the unfairness. In support of this argument, he relies on *State v. Jones*,[14] in which a serologist testified that she had compared hair examples from the defendant which she received in "'a different case.'" The trial court overruled the defense objection to the testimony, but it admonished the jury to disregard the witness' comments.[15] This court noted that a mistrial may be warranted when an admonition to the jury cannot erase the unfair prejudice,[16] but determined that the admonishment was sufficient to eradicate any unfair prejudice to the defendant.[17] In the case at bar, there was no admonishment because Dixon did not ask the court to do so. He argues on appeal that to request an admonishment would have brought the issue to the jury's attention and exacerbated the problem.

[7] A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial.[18] Instead, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[19] Here, that threshold was not met. Sorensen listed several general criteria he used in compiling the photographs which he showed to J.K., and he made no reference to any other crimes committed by Dixon. We conclude that Dixon has not demonstrated that he was actually prejudiced or deprived of a fair trial by Sorensen's testimony, and the district court did not abuse its discretion in overruling his motion for a mistrial.

## 2. Identification by Victim

Dixon argues that the district court erred in overruling his pretrial motion to suppress J.K.'s identification of him as her

---

[14] *State v. Jones*, 232 Neb. 576, 578, 441 N.W.2d 605, 607 (1989).

[15] *Id*.

[16] *State v. Jones, supra* note 14.

[17] *Id*.

[18] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011); *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009).

[19] *Id*.

assailant and in subsequently admitting her identification testimony at trial over his objection. He contends that the photographic array procedure through which J.K. first identified him was unduly suggestive, that J.K. did not observe her assailant unmasked for a sufficient time to make a reliable identification, and that there were inconsistencies in her testimony regarding the identification. The facts relevant to these issues were established primarily by the testimony of J.K. and Sorensen at the suppression hearing and at trial. We summarize that testimony now.

(a) Suppression Hearing

At a suppression hearing on November 17, 2009, J.K. testified that she was in the presence of her assailant for 10 hours and that she was able to observe him without a mask on two occasions. The first was when he entered the apartment, an encounter which lasted approximately 10 minutes. At that time, the lights were on in her kitchen and the television in the living room was on. The second was when he lay next to her on the bed. At that time, the lights were off.

J.K. testified that about a week after the assault, Sorensen presented her with a photographic array of individuals who matched the description she had given of her assailant. She recognized one of the photographs as someone who looked similar to her assailant. She believed Sorensen had shown her 20 photographs that day. She said she separated the photographs based on whether the individual looked like her assailant. When she reached the photograph of Dixon, she placed his photograph in a "maybe" pile and moved all of the other photographs into a "no" pile. She said she later told Sorensen she was 60- to 70-percent sure she had correctly identified her assailant. At the hearing, she testified that she was 100-percent sure that Dixon was the assailant. She was more certain "[b]ecause people look different in photos than they do in person." J.K. said she has astigmatism and wears glasses, but she was not wearing them the night of the assault.

Sorensen testified that another officer put together a list of individuals who matched the physical description given to police in connection with a series of recent sexual assaults

and robberies. Sorensen located photographs of the individuals whose names were collected by the other officer. He collected nine photographs of individuals who matched the physical description, using computer mug shots and driver's license photographs. Sorensen said J.K. looked through the photographs and put each on a pile until she got to the photograph of Dixon. She said the man in that photograph looked most similar to the person who assaulted her.

The trial court found that the procedures used by the police were "in no way unduly suggestive or conducive to irreparable mistaken identity." It also held that J.K.'s in-court identification should not be suppressed, because she testified that she based her identification on her "observations and memory relating to her attack" and "nothing else."

### (b) Trial

At trial, J.K. stated that she looked at photographs at the police station at the request of Sorensen about a week after the assault. After separating them into a "maybe" pile and a "no" pile, J.K. selected one as looking most like the person who assaulted her. J.K. said that the longer she looked at the photograph, the more nervous she got, and that her heart started pounding. Over Dixon's objection, she identified Dixon as the individual who assaulted her. Her identification was based on the time she spent with the assailant in her apartment. J.K. said she was 100-percent sure that Dixon was her assailant. On cross-examination, J.K. stated that she had been only 60- to 70-percent sure when she talked to Sorensen on the phone about a week after the initial identification, but she did not recognize any of the other men in the photographic lineup.

J.K.'s sister testified that J.K. called her before and after J.K. went to the police station to look at a photographic array. The sister advised J.K. to take her time when looking at the photographs, but she did not tell J.K. she must identify someone.

Sorensen testified at trial that he showed J.K. a series of photographs on May 2, 2009. Sorensen said J.K. went through each photograph until she reached the eighth one, which she set

aside. It was a photograph of Dixon. Sorensen said he did not give J.K. any instructions on how to separate the photographs. J.K. said that the photograph of Dixon looked most similar to the person who had assaulted her, but that she did not think the assailant had braids in his hair and that he appeared to be "more scruffy" than the person in the photograph.

Sorensen talked to J.K.'s sister on May 7, 2009, and then contacted J.K. again to find out what she had told her sister about the photographs. J.K. said she had told her sister the last photograph she looked at was the person who assaulted her. That photograph was of Dixon.

### (c) Resolution

In *State v. Nolan*,[20] we summarized the recent holding of the U.S. Supreme Court in *Perry v. New Hampshire*[21] regarding eyewitness identification as follows:

> [T]he Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*." Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct. When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.[22]

Applying these principles in *Nolan*, we concluded that the evidence regarding the challenged identification "falls far short

---

[20] *State v. Nolan,* s*upra* note 2.

[21] *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

[22] *State v. Nolan, supra* note 2, 283 Neb. at 63, 807 N.W.2d at 535, quoting *Perry v. New Hampshire, supra* note 21.

of the affirmative police misconduct that, under *Perry*, must be shown in order for pretrial suppression of the evidence to be appropriate."[23]

We reach the same conclusion here. Dixon argues that the State did not demonstrate a need for the type of photographic array used here, but Sorensen testified that at the time he assembled the array, no suspects had yet been identified. It is true that there are some minor discrepancies in the testimony regarding the manner in which the photographic array was presented. But these minor discrepancies do not make the procedure unduly suggestive. Based upon our de novo review, we conclude that the identification procedure was not tainted by affirmative police misconduct so as to require a preliminary judicial inquiry into the reliability of J.K.'s identification of Dixon as her assailant. The district court did not err in overruling Dixon's motion to suppress this evidence.

[8] Nor did the court err in permitting J.K. to identify Dixon at trial. As in *Nolan*, it was the jury's duty in this case to assess J.K.'s credibility, and Dixon was free to probe that issue through cross-examination, as he did. Likewise, Sorensen was subject to cross-examination with respect to the procedure used to develop the photographic array. It was for the jury to determine whether J.K. observed her assailant unmasked for a sufficient period of time to make a reliable identification and whether she had made inconsistent statements regarding her degree of certainty. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence presented; such matters are for the finder of fact.[24]

### 3. Motion for Directed Verdict

At the close of evidence, Dixon made a motion for directed verdict, which the court overruled. In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative

---

[23] *Id*. at 64, 807 N.W.2d at 535-36.

[24] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

value, that a finding of guilt based on such evidence cannot be sustained.[25] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[26]

Dixon argues that without J.K.'s identification of him as the assailant, the jury would have acquitted him. He claims her identification was not credible. As noted above, however, there was no error in the trial court's admission of the identification. The jury apparently believed J.K.'s identification of Dixon, and we are bound by its determination.

Dixon also argues that he was at work the night of the assault and that his phone records contradicted J.K.'s report that the man who attacked her was texting after the first sexual assault. The State introduced evidence from Dixon's employers that could support an inference that Dixon manipulated his work records to show that he was present when in fact he was not. The phone records that were introduced supported an inference that Dixon was in the vicinity of J.K.'s apartment at the time of the assaults. In addition, evidence was introduced that Dixon had access to latex gloves at both of his places of employment.

Viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[27] The evidence was sufficient to support the convictions.

### 4. Habitual Criminal Determination

[9,10] Dixon assigns that the district court erred in determining that he was a habitual criminal and sentencing him accordingly, because the State failed to prove prior convictions upon which habitual criminal status is premised.[28] In a proceeding to enhance a punishment because of prior convictions, the State has the burden of proving such prior convictions

---

[25] *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013).

[26] *Id*.

[27] See *id*.

[28] See § 29-2221 and Neb. Rev. Stat. § 29-2222 (Reissue 2008).

by a preponderance of the evidence.[29] In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings.[30]

The State offered the same evidence at the habitual criminal hearing in this case as it offered in *Dixon I*: four exhibits purporting to show prior felony convictions. Dixon's counsel objected to the exhibits, as he did in *Dixon I*, on the ground that the State did not establish that Dixon was the same person referred to in the exhibits reflecting the prior convictions. Counsel also reasserted his objection that because one of the convictions was for aiding and abetting first degree assault, it could not be used for habitual criminal enhancement. As it did in *Dixon I*, the district court overruled the objections, received the evidence, and sentenced Dixon as a habitual criminal.

We concluded in *Dixon I*:

The names in all four of the prior convictions are "Armon Dixon" or "Armon M. Dixon" and thus match Dixon's name. Because Dixon has not denied that he is the person referred to in these earlier convictions and has not presented any evidence contradicting the State's position, . . . this is sufficient. Moreover, the birth dates reflected on three of the prior convictions are consistent with Dixon's age. The State has proved the prior convictions by a preponderance of the evidence.[31]

We reach the same conclusion here.

---

[29] *Dixon I, supra* note 13; *State v. Alford*, 278 Neb. 818, 774 N.W.2d 394 (2009).

[30] *Dixon I, supra* note 13; *State v. Epp*, 278 Neb. 683, 773 N.W.2d 356 (2009).

[31] *Dixon I, supra* note 13, 282 Neb. at 292, 802 N.W.2d at 884.

Dixon urges that we reconsider our holding in *Dixon I* because it impermissibly shifts the burden of proof to the defendant. We disagree that our prior holding has that effect. The existence of a prior conviction and the identity of the accused as the person convicted may be shown by any competent evidence, including the oral testimony of the accused and duly authenticated records maintained by the courts or penal and custodial authorities.[32] Here, the State's evidence established a prima facie showing of prior convictions necessary for habitual criminal enhancement, and in the absence of any evidence to the contrary, the district court did not err in determining that the State had met its burden.

Dixon also repeats his argument from the prior appeal that the trial court erred in using a prior conviction for aiding and abetting for enhancement. We reject this argument for the same reasons we rejected it in *Dixon I*.[33]

## 5. EXCESSIVE SENTENCES

Dixon asserts that the trial court abused its discretion in imposing more than the mandatory minimum sentences required by the habitual criminal statute. He claims that the sentences are excessive when considering he has a 15-year-old daughter, he was working two jobs, he had graduated from high school, and he had a fatherly relationship with his girlfriend's children.

[11] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[34]

[12] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must

---

[32] *State v. Thomas*, 268 Neb. 570, 685 N.W.2d 69 (2004); *State v. Luna*, 211 Neb. 630, 319 N.W.2d 737 (1982).

[33] *Dixon I, supra* note 13.

[34] *State v. Wills, supra* note 4.

determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[35] The sentences imposed in this case were within the statutory limits, and there was no abuse of discretion by the trial court.

[13] Dixon also argues that the robbery sentence should have been ordered to be served concurrently to the sexual assault sentence, for the reasons that both relied on the same fact pattern and the robbery was ancillary to the sexual assault because the items stolen were taken to conceal the sexual assault offense. It is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes.[36] The crimes arose from the same incident, but they were completely different crimes with different elements. There was no abuse of discretion in the trial court's order of consecutive sentences.

### V. CONCLUSION

Finding no merit in any of Dixon's assignments of error, we affirm the judgment of the district court.

Affirmed.

Cassel, J., not participating.

---

[35] *State v. Erickson, supra* note 3.

[36] *State v. Start*, 239 Neb. 571, 477 N.W.2d 20 (1991).

---

Ladd D. Krings, appellee, v. Garfield County Board of Equalization, appellee, and Douglas A. Ewald, Tax Commissioner, and Ruth A. Sorensen, Property Tax Administrator, appellants.

___ N.W.2d ___

Filed July 26, 2013.    No. S-12-623.

1. **Taxation: Judgments: Appeal and Error.** Appellate courts review decisions rendered by the Tax Equalization and Review Commission for errors appearing on the record.