IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BOYE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JESSE E. BOYE, APPELLANT.

Filed February 21, 2017.    No. A-16-545.

Appeal from the District Court for Saunders County: JAMES C. STECKER, Judge. Affirmed.

Megan E. Jeffrey for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Following a jury trial, Jesse E. Boye (Boye) was convicted of possession of methamphetamine with intent to deliver. He challenges his conviction and his sentence. For the following reasons, we affirm.

BACKGROUND

On January 2, 2015, law enforcement executed a search warrant at a residence on Furnas Street in Ashland, Nebraska. Boye lived at the residence with his ex-wife (Tracie Boye), and his father (Fred Boye). Boye was present when the search warrant was executed, during which time methamphetamine was found in the residence.

On March 9, 2015, the State filed an information charging Boye with possession of methamphetamine with intent to deliver, a Class II felony, pursuant to Neb. Rev. Stat. § 28-416(1), (2)(a) (Cum. Supp. 2014). The information also alleged that Boye was a habitual criminal pursuant to Neb. Rev. Stat § 29-2221(1) (Reissue 2016).

- 1 -

On March 24, 2015, Boye filed a motion to suppress evidence obtained as a result of the execution of search warrants on his Furnas Street residence. Boye asserted that "law enforcement officials, in execution of the above mentioned search warrants, overstepped their commission of authority when searching [his] residence," and that "such search or searches were in violation of the 4th and 14th amendments to the United States Constitution." We note that based on our record, it appears there was only one search warrant executed.

On February 5, 2016, a hearing was held on Boye's motion to suppress. Chief Joseph Baudler with the Ashland Police Department testified that on December 30, 2014, a disturbance was reported at a residence on Furnas Street after Fred Boye (Fred) got mad at Jesse Gosch, who had been staying at the residence off-and-on. Fred hit Gosch with a baseball bat. After the baseball bat was taken away from him, Fred retrieved a shotgun from a bedroom, and a fight ensued, during which Fred was hit with the baseball bat and had his jaw broken. When the police arrived, Fred was taken to the hospital in a squad car. An officer asked about the shotgun and Boye "took them into the bedroom, found part -- found a shotgun barrel and a shell casing, [the officer] asked him for more permission to search and he said not without a warrant." Baudler did not know if the officer searched for the weapon part, or if Boye got it and brought it out.

Chief Baudler testified that because there were supposedly more parts to a gun inside the residence, the officers wanted to find more evidence to support the crime of terroristic threats and assault. On December 31, 2014, Baudler asked for and received a search warrant for the residence. The occupants of the residence were Boye, Tracie Boye (Tracie), and Fred. The search warrant was executed on January 2, 2015, and allowed the search of the residence and the persons of Boye, Tracie, and Gosch (all of whom were convicted felons, "so none of them were supposed to have firearms inside the house").

Chief Baudler testified that during a search of the residence, officers located controlled substances on the floor "right inside the front door," and "in the bedroom of [Boye] and Tracie." By the front door, officers found a little container with about .12 grams of methamphetamine, a bag with about 2 grams of methamphetamine, and some marijuana. In the bedroom, officers found a scale, plastic bags with residue methamphetamine, a methamphetamine pipe, a "snort" straw, and miscellaneous drug paraphernalia on the bed. A marijuana pipe was found on the dresser next to the bed. A methamphetamine pipe, miscellaneous drug paraphernalia, a bag with residue, and a credit card with Tracie's name on it were found on the floor next to the bed. Plastic baggies, a "30/30" shell casing, and a container with residue were found on an end table next to the bed. No controlled substances were found on Boye.

The search warrant, received into evidence as exhibit 1, was issued "for the purpose of discovering and seizing" the following: "[f]irearms, firearm parts or ammunition used in firearms other dangerous weapons, firearms, ammunition, holsters, gun cases and related attachments and documents of venue . . . and any indicia of ownership or residency." Boye's counsel questioned the State's authority to seize drugs "that were not listed on the warrant." The State responded that the items were in plain view during the execution of the warrant and were otherwise found in areas that officers could have found ammunition. The State argued that the officers were not required to "turn their eye" or to seek a second search warrant when the illegal nature of the items was immediately apparent. The district court overruled Boye's motion to suppress.

On February 4, 2016, Boyed filed a motion in limine requesting that the State be prohibited from introducing evidence or otherwise disclosing to the jury any information, reports, conclusions, or test results regarding all items seized from the common area of his Furnas Street residence until or unless the State was able to establish his ownership or control of the seized items. At the February 24 hearing, the district court overruled Boye's motion in limine regarding the drugs found in the common area of the residence stating, "it will be for the State to prove any direct or indirect connection with the defendant, so that will be a fact for the jury to determine." Also at the hearing, Boye raised a second motion in limine asking that neither party "mention the prior sex assault case that your Honor heard yesterday or any reference to it." The State said it had "no problem" not mentioning the specifics of Boye's prior criminal history, but thought Boye could testify to the fact he is a convicted felon on numerous felonies. The district court granted the motion in limine regarding the sexual assault case stating "[t]he rule is that you can ask if he's been convicted of a felony but you can't inquire as to specific convictions."

A jury trial was held on February 24 and 25, 2016. The State called several witnesses and introduced numerous exhibits into evidence. Boye also testified. A summary of the testimony and evidence follows.

Chief Baudler testified that on December 30, 2014, a police officer responded to a call for assistance on Furnas Street. There were reports that a firearm had been used at that address. The officer was told that the firearm had been dismantled, and only parts of the firearm were recovered. As part of the investigation, Baudler asked for and received a search warrant for the Furnas Street residence. The occupants of the residence were Boye, his ex-wife Tracie, and his father Fred. Another man, Gosch, would stay there from time-to-time, sleeping on the sofa (which was "a foot or two" away from the front door).

Chief Baudler executed the search warrant on January 2, 2015, along with four other officers, including Officer Christopher Engel. Baudler knocked on the front door of the trailer home and observed Boye walk from the back bedroom to the front door; when Boye looked out the door's window and saw the officers he "ducked down out of sight." Baudler yelled "Police, search warrant, we demand entry," at which time he observed Boye turn and head to the back part of the trailer. The officers entered the trailer and detained Boye. Tracie walked out of the east bedroom and was also detained. Once Boye and Tracie were secured, they were presented a copy of the search warrant and advised of their *Miranda* rights.

Chief Baudler testified that right next to the front door (within 6 to 12 inches of where Boye had been when he "ducked" out of sight) officers saw a pill bottle containing a small amount of marijuana; there was a container that had about .2 grams of methamphetamine, and a plastic bag that had about 2 grams of methamphetamine with another bag inside containing .2 grams of methamphetamine. A forensic drug analyst with the Nebraska State Patrol Crime Lab testified that the three items found by the door contained methamphetamine with weights of 1.847 grams, 0.2665 grams, and 0.1779 grams.

Chief Baudler testified that based on his training and experience, he is able to distinguish between methamphetamine that is possessed for personal use versus that possessed for sale. When drugs are possessed for sale, other things are sometimes involved such as packaging material, scales, weapons used to protect the illegal narcotics operation, and proceeds from the sales. Some

people sell drugs in order to afford their own drug habit, because methamphetamine is an expensive drug costing $100 per gram. According to Baudler, a $20 (.2 g) to $100 (1 g) amount is a typical "street user size." And with a "user," you would not typically expect to find them with several individual baggies of methamphetamine as well as a larger quantity because "usually they're purchasing it and then they're using it."

According to Chief Baudler, the ".2 grams [found by the front door] would be packaged for sale. . . . But it would be also for -- when you say personal use, it would be something that somebody -- it would be a size that somebody would typically buy, too, on the Street." As for the 1.8477 grams of methamphetamine, "if a person is a wealthy person, maybe buying that much meth for personal use . . . [b]ut typically at the low level of the street end, that would be something more than what a typical street user would be able to come up with that much money." At the time the search warrant was executed, Boye, Tracie, Fred, and Gosch were all unemployed. In Baudler's experience, the drugs found (the two baggies and the container) were packaged for sale. Baudler believed that Boye panicked and threw the drugs down by the front door when he saw the officers.

During the execution of the search warrant, Chief Baudler fulfilled the role of the receipt and inventory officer, whose job it was to note who found what evidence and the location where it was found. Officer Engel found a digital scale, unused plastic bags, some plastic bags with residue, a methamphetamine pipe, and various drug paraphernalia (e.g. spoon and straw) in the east bedroom, which was used by Boye and Tracie. In addition, a "spent 30-30 casing container with residue and more plastic baggies" were located on the end table next to the bed in Boye and Tracie's bedroom. Regarding the large number of plastic baggies, Baudler testified that they are commonly used to package illegal narcotics and would not be something you commonly find if someone possesses the drugs for personal use. The digital scale is used for "dividing up smaller amounts of stuff," and is consistent with something you would find with an individual who is selling controlled substances. Based on the items found and the location of the drugs (near the front door and in his bedroom), it was Baudler's opinion that Boye possessed the methamphetamine with the intent to sell.

On recross-examination, when Chief Baudler was asked if it was possible that the drugs found were not for sale, but just for home use, he responded "yes;" but on further redirect, when asked, based on his training and experience, if that was likely, he said "no." He also testified on cross-examination that when Boye was searched, the only thing found on his person was $88. When Tracie was searched, she had "a methamphetamine pipe in her vagina and some pills."

Officer Engel testified that he assisted in executing the search warrant on January 2, 2015. His role was to help secure the suspects and ultimately conduct a search of the residence. Officer Engel searched the east bedroom in the trailer. On the bed, he found a bag which contained a methamphetamine pipe, a scale "to weigh out narcotics or controlled substances," baggies which "based off of their size were consistent with packaging for the sale and distribution of narcotics or controlled substances," and other multiple baggies with residue inside of them. On the floor next to the left side of the bed, Officer Engel found a bag containing drug paraphernalia (e.g. "snort" straw and methamphetamine pipe) and a debit card with Tracie's name on it. On a night stand on the left side of the bed, he found a container with residue, some baggies, and an empty rifle shell casing. Officer Engel did not know whether Boye or Tracie slept on the left side of the bed.

Tracie testified that Boye is her ex-husband. On January 2, 2015, she and Boye were living in a trailer on Furnas Street with his father; she and Boye shared a bedroom. Tracie "[has] a horrible methamphetamine addiction," but said she has been clean since June 2015. On January 2, 2015, they were expecting their friend (Gosch) to come over, but instead it was the police. The police broke down the door, searched the residence, and found drugs, scales, and baggies. She and Boye both used the drug paraphernalia in the bedroom.

Tracie testified that between December 30, 2014, and January 2, 2015, she and Boye were actively selling methamphetamine. They would "both bye [sic] the methamphetamine half and half, and I would sell it for the post [sic] part, but occasionally he would sell a little bit." She said "we had a lot of people going in and out of there. And, like I said, we'd bye [sic] the dope and split it to split the money I would usually do the selling. But when I ran out of people, he had people he wanted[.]" Neither Tracie nor Boye had a job, and they sold drugs to support themselves. On January 2, Tracie did not have any methamphetamine to sell because she "had sold the rest of [hers] the night before, but [Boye] had a little bit of his left"; they each started out with about 3.5 grams.

Tracie acknowledged that she was prosecuted regarding the events of January 2, 2015. When asked if she "was given any plea agreement or plea bargain or reduction in charges to testify," any sentencing recommendation or consideration, or whether the State did "anything for you to get you to testify," she responded, "[n]o." On cross-examination, she acknowledged that she was currently incarcerated for charges related to the events of January 2.

Boye testified in his own behalf. He said that on December 30, 2014, his father and Gosch (who had been staying with them for about 30 days at that time) got "in a scuffle out in the living room." Gosch yelled for help, and when Boye got out there his father had a baseball bat. Fred told Gosch to get out because he was being lazy and then hit him with the baseball bat. Boye took the baseball bat from his father and put it in his bedroom. About 60 seconds later, Boye heard more yelling and went back to the living room to "break it up." Boye then went back to his bedroom and Fred came in with a shotgun a couple minutes later and told Tracie "that she was next or something like that." Boye took the shotgun from Fred, shut the door, and called the police. When the police came, Fred was arrested and taken to the hospital for some injuries. Boye helped the officer search the house for the weapon. "We ended up finding pieces of it but not the whole thing." The officer left, said he would be back later, and told Boye to bring any more parts he found down to the station.

Boye testified that on January 2, 2015, he was sitting in a recliner in the living room and heard a knock at the door. He thought it was Gosch. Boye said he unlocked the door and started walking back through the kitchen; "I figured [Gosch] would hear the door unlocking and just walk in." After Boye walked away he "heard them say 'Ashland Police department, search warrant' and they kicked the door open." Boye did not have any drugs on him at the time and did not discard anything near the door. He and Tracie were secured by the officers. Boye said that officers found the methamphetamine behind the front door in "a box of clothes" and Boye did not know to whom the clothes belonged. He denied that the drugs located in the common area were his. He also denied that the drugs and paraphernalia in the bedroom were his; he said that was "all Tracie's stuff" and

that the police found it on her side (the left side) of the bed. Boye knew that Tracie sold methamphetamine but he denied that he sold it.

The jury found Boye guilty of possession of methamphetamine with intent to deliver. After an enhancement hearing, the district court found Boye to be a habitual criminal. He was subsequently sentenced to 10 to 12 years' imprisonment. The sentence was to be served consecutively to the sentence imposed in a separate criminal court case. Boye appeals.

## ASSIGNMENTS OF ERROR

Reordered, Boye assigns (1) the district court improperly overruled his motion to suppress, (2) the district court did not allow him to cross-examine Tracie's "bias related to the plea bargain and/or favorable sentencing or release consideration," (3) his conviction was not supported by sufficient evidence, and (4) the district court imposed an excessive sentence.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

*Motion to Suppress.*

Boye asserts that the district court erred in denying his motion to suppress evidence. However, Boye failed to renew his motion to suppress at trial or otherwise object to the receipt into evidence of items seized during the execution of the search warrant based on his motion to suppress. When he did make objections at trial to the receipt of items seized, the objections were based on relevance and unfair prejudice.

Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal. *Id.* In *State v. Oldson*, Oldson assigned as error the trial court's denial of his motion to suppress certain recorded conversations based on an affidavit in support of a warrant for Oldson's arrest containing false information in violation of the Fourth Amendment. When the recorded conversations were offered at trial, although objections were made to the statements on the grounds of foundation, confrontation, and due process, no objection was made to the evidence under the

Fourth Amendment, nor was there any renewal of the motion to suppress. The Nebraska Supreme Court held that an objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on some other ground not specified at trial. *Id*. And because Oldson failed to renew his Fourth Amendment objection at trial, he was deemed to have waived his assignment of error concerning his motion to suppress.

The same is true here. Although Boye did make objections at trial to the receipt of the items seized, the objections were based on relevance and unfair prejudice. Boye did not renew his Fourth Amendment objection at trial, and therefore, he waived his assignment of error concerning his motion to suppress.

*Cross-Examination of Tracie.*

Boye asserts that the trial court did not allow him to cross-examine Tracie's "bias related to the plea bargain and/or favorable sentencing or release consideration." Brief for appellant at 14. He argues that Tracie's testimony was not reliable and that he was not allowed to test her credibility in that his counsel was "denied pursuing this line of questioning [regarding her plea deal] because the identification of a Class IV versus a Class II [felony] would disclose sentence information to the jury." *Id*.

During direct examination, Tracie testified that she was willing to testify for the State because "I'm just ready to tell the truth, everything. I mean, I don't know if that's . . . in [Boye's] good or not good [sic]. It's time to tell the truth." She acknowledged that she was prosecuted regarding the events of January 2, 2015. When asked if she "was given any plea agreement or plea bargain or reduction in charges to testify," any sentencing recommendation or consideration, or whether the State did "anything for you to get you to testify," she responded, "[n]o."

Prior to cross-examination, the following discussion was had between defense counsel, the State, and the court outside the presence of the jury.

> [Defense Counsel]: . . . I believe [the State] has opened the door with regard to the disposition of [Tracie's] case that arose out of the January 2nd, 2015, date.
>
> [The State]: She's incarcerated. She's serving a consecutive sentence.
>
> [Defense Counsel]: Okay. Then I just wanted to get that on the record in terms of convictions, prior bad acts.
>
> [The State]: I think what it was you still can't go into, but she pled to the information as charged and she serves -- she's serving a consecutive sentence.
>
> [Defense Counsel]: So in your eyes we can't talk about the fact that it was a Class IV, not a Class II.
>
> THE COURT: You do that and you open the door to your own client's charge, which you don't want to do.
>
> [Defense Counsel]: That's why I wanted to talk about it out of the presence of the jury. Okay. Open my own client's charge as it pertains to this case?
>
> THE COURT: Well, you connect the dots as to what his charge is if you go into hers.

[Defense Counsel]: I'm sorry. I don't follow. His charge as pertains to this case, because the thing we're seeking to keep out is prior bad acts, prior convictions. If [the State] has opened the door to the disposition in this case --

THE COURT: But if you're connecting the dots as to what her charge was in terms of felony, they're going to connect the dots that he's charged with the same thing.

[Defense Counsel]: They are [sic] already know what he's charged with, don't they?

THE COURT: But they don't know what class.

[The State]: They don't know the level of offense, felony or misdemeanor, none of that. That wasn't read as part of the information and that's nothing that they get.

THE COURT: And that's not something they can be told.

[Defense Counsel]: Okay. Now I understand. Thank you for clarifying. I just thought everybody knows possession with intent is a Class II.

THE COURT: The jury does not.

[Defense Counsel]: All right. Thank you.

After the above discussion occurred, the jury returned and Boye's counsel proceeded to cross-examine Tracie. Counsel asked only one question: "Regarding the events of January 2nd, 2015, you are currently incarcerated for those charges; is that correct?" To which Tracie responded, "I am." Boye's counsel then informed the court that there were no further questions.

Boye argues that he was "prohibited from testing [Tracie's] interest in 'the truth' because he could not question the veracity of her interpretation of events." Brief for appellant at 14. Boye seems to base this argument on the colloquy set forth above related to disclosing the level of offense involved. However, it is clear from the record that the district court simply informed defense counsel that if counsel questioned Tracie regarding the class of felony she pled to, then counsel opened the door to revealing the specific penalty classification of Boye's charge. Defense counsel could have pursued a line of questioning with Tracie to challenge her credibility or her memory of the events of January 2, 2015, but counsel chose not to do so. The record before us does not support Boye's assigned error regarding his ability to cross-examine Tracie.

*Sufficiency of Evidence.*

Boye argues that there was not sufficient legal evidence to convict him of possession of methamphetamine with intent to deliver. His claim is essentially that the amount of methamphetamine found was consistent with personal use, and that Chief Baudler's testimony was inconsistent. However, in reviewing a criminal conviction for a sufficiency of the evidence claim, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

Pursuant to § 28-416(1), it is unlawful for any person to knowingly or intentionally possess, with intent to deliver, a controlled substance. And methamphetamine is a controlled substance. Neb. Rev. Stat. § 28-405 (Reissue 2016).

The State presented testimony and evidence that methamphetamine was found next to the front door of the residence (within 6 to 12 inches of where Boye had been when he "ducked" out of sight). In the bedroom Boye shared with Tracie, officers found a digital scale, unused plastic bags, plastic bags with residue, a methamphetamine pipe, and various drug paraphernalia. According to Chief Baudler, the .2 grams of methamphetamine found by the front door "would be packaged for sale. . . . But it would be also for -- when you say personal use, it would be something that somebody -- it would be a size that somebody would typically buy, too, on the Street." As for the 1.8477 grams of methamphetamine, he said that "if a person is a wealthy person, maybe buying that much meth for personal use . . . [b]ut typically at the low level of the street end, that would be something more than what a typical street user would be able to come up with that much money." At the time the search warrant was executed, Boye, Tracie, Fred, and Gosch were all unemployed. In Baudler's experience, the drugs found were packaged for sale. Baudler acknowledged it was possible the drugs found were not for sale, and were just for home use, but based on his training and experience he did not think that was likely. Additionally, regarding the large number of plastic baggies found in the bedroom, Baudler testified that they are commonly used to package illegal narcotics and would not be something you commonly find if someone possesses the drugs for personal use. And the digital scale is consistent with something you would find with an individual who is selling controlled substances. Finally, Tracie testified that between December 30, 2014, and January 2, 2015, she and Boye were actively selling methamphetamine to support themselves. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Boye of possession of methamphetamine with intent to deliver.

*Excessive Sentence.*

Boye asserts that the district court imposed an excessive sentence. He was sentenced to 10 to 12 years' imprisonment, to be served consecutively to the sentence imposed in a separate criminal court case.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

The presentence investigation (PSI) in our record was completed in July 2015 for a separate criminal case (CR13-104) in which Boye was convicted of first degree sexual assault, third degree assault, and first degree criminal trespass. At the sentencing hearing in the instant case, reference was made to a PSI update and a statement by Boye, but neither appears in our record. Accordingly, any information set forth below regarding Boye's personal information and criminal history comes from the PSI prepared in July 2015.

Boye was 37 years old at the time of the crime. Although divorced, he was still involved with his ex-wife, Tracie. He has no children. Boye obtained a GED while previously incarcerated. He was unemployed.

Boye's adult criminal history consists of convictions for theft by unlawful taking (twice), escape, attempted burglary, and third degree domestic assault. He has also been fined for possession of one ounce or less of marijuana (twice), DUI (twice), obstructing a peace officer, failure to appear, criminal mischief, disturbing the peace, open container (three times), negligent driving, leaving the scene of an accident, no proof of insurance, no life preserver, violation of "camping regs.," and various other traffic offenses. He also had two ongoing cases in Saunders County: the first was for second degree assault and use of a deadly weapon to commit a felony, charges for which a warrant had been issued on March 12, 2015; the second was for "Del/Intent to Deliver Exceptionally Hazardous Drug." Additionally, he was awaiting sentencing for recent convictions for "sexual assault/forcible-1st Degree," third degree assault, and first degree criminal trespass. As part of the July 2015 PSI, the probation office conducted a Level of Service/Case Management Inventory, which assessed Boye in the "very high" risk category for recidivism.

At the sentencing hearing in the instant case, the State said that in reading the PSI update and Boye's statement, "it seems Mr. Boye has, again, painted himself as the victim in this matter." The State noted that "while he was on release for the sex assault case, not only did he pick up this charge, he also has a stabbing out of Cass County, use of deadly weapon to commit a felony, with a habitual criminal allegation as well." "So while [he] likes to present himself as a victim in all of his cases," Boye is an individual that society deserves to be protected from."

In response, Boye's counsel argued that it was "true that [Boye] has been kind of a product of the system pretty much his whole life, and it's clear that he has a long family history, who are also products of the system." Counsel said Boye's "biggest crime in this particular case was not having any place to go, was choosing to live with his family once he . . . bonded out from his other charge," and that "he had to turn a blind eye to a lot of what was going on in that house." Boye addressed the court saying he wished he "would have done more to change what was going on instead of looking the other way." Counsel asked the court to consider the punishment in light of the circumstances surrounding it.

The district court said that it reviewed the probation file, the police reports, and Boye's statement. The court noted that Boye committed this crime while the sexual assault charge was pending. The court found that Boye was not a fit and proper candidate for probation because the "risk is substantial" that he would engage in additional criminal conduct, and that he should be committed to a correctional facility.

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Dixon, supra*. And it is the minimum portion of an indeterminate sentence which measures its severity. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

Boye was convicted of possession of methamphetamine with intent to deliver, a Class II felony, with a habitual criminal enhancement. Because he was sentenced as a habitual criminal, his crime was punishable by a mandatory minimum sentence of 10 years' imprisonment, and a maximum sentence of 60 years' imprisonment. § 29-2221. We note that the district court orally

pronounced Boye's sentence to be 10 to 12 years' imprisonment. However, in its written order, the district court stated the sentence was 10 to 14 years' imprisonment. When the sentence orally pronounced at sentencing differs from a later written sentence, the former prevails. *State v. Sims*, 277 Neb. 192, 761 N.W.2d 527 (2009). See, also, *State v. Russell*, 291 Neb. 33, 863 N.W.2d 813 (2015) (Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2014) plainly states pronounced terms of imprisonment prevail over any conflict with truth-in-sentencing advisements). Accordingly, Boye was sentenced to 10 to 12 years' imprisonment. And the district court ordered the sentence to be served consecutively to the sentence imposed in a separate court case (CR13-104).

In his brief, Boye argues that in his separate criminal court case CR13-104, he was also found to be a habitual criminal and what makes the sentence in the instant case disproportionate to the nature of the offense has to do with the "consecutive habitual sentences," because with the "combined habitual criminal sentences, [he] will serve at least 20 years in jail, with no good time." Brief for appellant at 16. He argues that "[u]nder proportionality, a punishment normally acceptable may be determined to be cruel and unusual if said punishment is out of proportion to the severity of the crime for which it is imposed." *Id*. at 15. In response, the State in its brief argues "the sentence received by Boye in another case is not at issue on this appeal. That sentence was for a separate crime, and Boye thus received a separate sentence." Brief for appellee at 12. The State noted that it is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes. See *State v. Dixon, supra*.

Initially, we note that nothing in our record shows that Boye was found to be a habitual criminal in case CR13-104. And even if he was, we still agree with the State. The minimum portion of Boye's sentence in the instant case was the lowest allowed, a mandatory 10 years' imprisonment. And, as noted by the State, it is within the discretion of the trial court to impose consecutive rather than concurrent sentences for separate crimes. See *State v. Dixon, supra*. See, also, *State v. Hurbenca*, 266 Neb. 853, 669 N.W.2d 668 (2003) (a sentence of 10 to 15 years' imprisonment to be served consecutively to any sentence currently served, with a mandatory 10-year term, is not a cruel and unusual punishment, nor is it an excessive sentence, of one who has been adjudged to be a habitual criminal). Having considered the relevant factors in this case, we find that Boye's sentence is not excessive or an abuse of discretion and his sentence is therefore affirmed.

## CONCLUSION

For the reasons stated above, we affirm Boye's conviction and sentence.

AFFIRMED.