STATE OF NEBRASKA, APPELLEE, V.
ANGELO TOLBERT, APPELLANT.
___ N.W.2d ___

Filed August 1, 2014.    No. S-13-847.

1. **Criminal Law: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
2. **Sentences.** Imposing a sentence within statutory limits is a matter entrusted to the discretion of the trial court.
3. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
4. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
5. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
6. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

Appeal from the District Court for Douglas County: W. MARK ASHFORD, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Scott C. Sladek, and Brenda J. Leuck for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

Heavican, C.J.

## INTRODUCTION

Angelo Tolbert was convicted of first degree murder, first degree assault, and two counts of use of a deadly weapon to commit a felony. He was sentenced to life imprisonment on the murder count and 40 to 50 years' imprisonment on each of the other three counts, to be served consecutively. Tolbert appeals. We affirm.

## FACTUAL BACKGROUND

In the early morning hours of October 21, 2012, a group of teenagers—Montrell Wiseman, Desjuha Wilkinson, Shamika Parks, and Onticha Gresham—were all gathered in front of the Gresham residence near 21st and Binney Streets in Omaha, Nebraska. The group noticed a van drive past slowly on two occasions. After the van's second pass, the group became nervous and decided to go into the house. As the group made its way into the house, two shots were fired. One shot struck and injured Wilkinson. Another struck and killed Wiseman. It was later determined that due to their red-colored clothing, the group of teenagers was mistakenly targeted by the shooter as being members of a rival gang.

A neighbor, Vincent Anderson, witnessed the shooting. Anderson testified that he heard a vehicle coming up the alley behind his house, so he looked out the window and saw a van. Anderson testified that he went outside because he was concerned that the van was there to dump trash at a nearby condemned house. As Anderson exited his house and headed into the alley, he heard a "boom," saw a flash, and witnessed an individual located behind the van's driver, holding a shotgun. In addition, Parks testified that she also saw a flash coming from the driver's side of the vehicle and that she thought the sliding door to the van might have been open.

After the shooting, the van crashed into a nearby pole. Witnesses reported seeing four individuals flee the van following the crash, but one returned. A fifth individual never left the scene. Parks also testified that she witnessed some of the individuals in the van flee following the shooting and that she thought one might have been carrying "a long gun."

Anderson also testified that he saw one of the individuals, though not the driver, leave the van with "something long" that might have been a gun. And another neighbor testified that the fourth individual to leave the van was "carrying something."

The van was registered to Constance Brown. Brown testified that on October 21, 2012, she lived near 42d and Ohio Streets in Omaha. Besides her children, Brown testified that she lived with her sister and several nephews, including Matthew Saunsoci; her brother Francis Cayou; and Joshua VanAckeren. Brown testified that in the early morning hours of October 21, she loaned her van to VanAckeren and Cayou, so they could go buy alcohol. Brown testified that in addition to VanAckeren and Cayou, Tolbert and Adam Gamble were at her home, but that she was not aware of who was with VanAckeren and Cayou when they left in her van.

The State's two primary witnesses at trial were Cayou and Gamble. Gamble testified first. He testified that he was with VanAckeren, Tolbert, and Saunsoci on October 21, 2012. He indicated that after spending some time at the 42d and Ohio residence, the group went "riding around" in Brown's van. According to Gamble, VanAckeren was driving; Cayou was in the front passenger seat; Tolbert was seated behind the driver in the middle row; he, Gamble, was seated in the middle row behind the passenger; and Saunsoci was in the back seat. Gamble testified that Cayou had a shotgun.

Gamble testified that after the group had driven around for approximately 20 minutes, they pulled up beside two people standing next to a car. At this point, Cayou handed Tolbert the gun, VanAckeren stopped the van, and Tolbert got out and shot at the people. The shooting was unsuccessful, however, because the shotgun still had the safety on. According to Gamble, upon returning to the van, Tolbert handed the shotgun back to Cayou, who took it off safety. VanAckeren then drove off.

Gamble then testified that VanAckeren stated they were headed "down to the Bottom area," which was rival gang territory. Upon arriving in that area, VanAckeren and Cayou

spotted some individuals wearing red shirts. Cayou again handed Tolbert the gun. According to Gamble, Tolbert stepped out of the van on the driver's side of the vehicle and discharged the shotgun twice. Tolbert then got back into the van, and VanAckeren began to drive away before crashing the van.

After the crash, Gamble testified that he, Cayou, and Tolbert exited the van and began running, leaving the shotgun in the van. According to Gamble, after about 20 minutes, he and Tolbert headed off together and Cayou went separately.

Cayou also testified that he, VanAckeren, Gamble, Saunsoci, and Tolbert were together on October 21, 2012. According to Cayou, at some point, the five left to get more alcohol. Consistent with Gamble's testimony, Cayou stated that Saunsoci was sitting in the back seat of the van, while Tolbert and Gamble were in the middle seat on the driver's and passenger sides, respectively. Cayou testified that he was in the front passenger seat and that VanAckeren drove. Cayou testified that VanAckeren had brought a shotgun with him into the van.

Cayou testified that rather than going to get more alcohol, he and VanAckeren discussed "going down to the Bottoms and shootin' somebody." According to Cayou, the van first came upon a parked car. Cayou testified that he handed Tolbert the gun to "bust on that car," but that the gun was on safety. Cayou testified that he reached back and switched off the safety, but that Tolbert kept the gun.

After this first, unsuccessful, shooting attempt, the van left the scene. According to Cayou, the group then came upon a group of people standing on a porch. These individuals were wearing red, a color worn by members of a rival gang. Cayou testified they drove by slowly, then stopped and turned off the van lights. After the lights were off, the van began moving again. Tolbert then opened the sliding door of the van and shot at the individuals.

After Tolbert shot at the group, VanAckeren drove off, but crashed the van into a pole. Cayou testified that after the crash, everyone got out of the van except Saunsoci. Cayou testified that he, Gamble, and Tolbert ran off down the alley,

with VanAckeren right behind them, carrying the shotgun. VanAckeren disposed of the shotgun in the alley and then returned to the van for Saunsoci.

When law enforcement arrived at the scene, they found a van parked near a utility pole with front-end damage on the passenger side. Two individuals were found in or near the van: VanAckeren and Saunsoci. A shotgun was found in the alley, and two large-caliber rifle rounds were found nearby. At the Gresham home, Wiseman's body was in front of the door to the residence and inside was an injured Wilkinson.

Following the State's case in chief, Tolbert filed a motion to dismiss, which was denied. Following the presentation of his defense, Tolbert renewed his motion. The motion was again denied. The jury then deliberated, and on June 5, 2013, returned verdicts of guilty of first degree murder, first degree assault, and two counts of use of a deadly weapon to commit a felony.

On August 23, 2013, Tolbert filed a motion for new trial based upon newly discovered evidence. In his motion, Tolbert alleged that Cayou had recanted his trial testimony; he included with his motion Cayou's affidavit to that effect.

In response, the State offered two affidavits. The first affidavit was from the admissions manager at the Douglas County Correctional Center explaining the housing of Cayou, Tolbert, and a third inmate. The affidavit explained that Cayou and this inmate were housed in the same unit; that Tolbert was housed in a separate unit; and that it was possible for prisoners to communicate between the two units.

The second affidavit was another affidavit from Cayou. In this second affidavit, Cayou averred that he had signed the earlier affidavit only after another inmate, who identified himself as Tolbert's cousin, threatened Cayou that he would be "'jumped'" if he did not recant his testimony. Cayou averred that he signed the first affidavit and then informed his counsel of his action, including the reasons behind it. Cayou's second affidavit is at least partially corroborated by the affidavit from the admissions manager. The district court denied Tolbert's motion for new trial. Tolbert appeals.

## ASSIGNMENTS OF ERROR

Tolbert assigns as error that (1) there was insufficient evidence to support his convictions, (2) the sentences imposed were excessive, and (3) the district court erred in denying his motion for new trial.

## STANDARD OF REVIEW

[1] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

[2] Imposing a sentence within statutory limits is a matter entrusted to the discretion of the trial court.[2]

[3] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[3]

## ANALYSIS

### Sufficiency of Evidence

In his first assignment of error, Tolbert argues that the district court erred in concluding there was sufficient evidence to support his convictions. Tolbert contends that the testimonies of Gamble and Cayou were inconsistent, both with each other and with the testimony of the other witness to the shooting, Anderson, so as to make their testimonies not believable. Tolbert also argues that Gamble's and Cayou's levels of intoxication created reasonable doubt as to their ability to remember and further alludes to the veracity of Gamble's and Cayou's

---

[1] *State v. Filholm*, 287 Neb. 763, ___ N.W.2d ___ (2014).

[2] *State v. Burton*, 282 Neb. 135, 802 N.W.2d 127 (2011).

[3] *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

testimonies due to the agreements each reached with the State for a reduction in charges.

These arguments are without merit. As we noted above, the principles of law are clear: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[4] But this is exactly what Tolbert asks us to do.

Tolbert argues that the testimonies of Anderson, Gamble, and Cayou were in conflict. However, this court does not resolve such conflicts—a jury does. Tolbert argues that Gamble and Cayou were so drunk as to be untrustworthy. But this goes to the credibility of these witnesses, and this court does not assess credibility. Nor does the fact that both Gamble and Cayou had entered into agreements with the State involve a determination made by this court. That also goes to credibility, which is the province of the jury.

Both Gamble and Cayou testified that Tolbert was the shooter. This testimony, which was corroborated by other evidence, was sufficient to support Tolbert's convictions. Tolbert's first assignment of error is without merit.

### Excessive Sentences

Tolbert next assigns that the district court erred in imposing upon him excessive sentences.

[4,5] The relevant principles of law are well known. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

---

[4] See *Filholm, supra* note 1.

[5] *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

[6] *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[6] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[7]

First degree murder is a Class IA felony[8] for which the only allowable sentence is life imprisonment.[9] First degree assault is a Class II felony[10] punishable by 1 to 50 years' imprisonment.[11] And use of a weapon to commit a felony is a Class IC felony when that weapon is a firearm.[12] The mandatory punishment for a Class IC felony is 5 to 50 years' imprisonment.[13]

Tolbert was sentenced to life imprisonment for first degree murder; this was the only sentence available to the district court and, as Tolbert seems to agree, was not an abuse of discretion. Rather, Tolbert argues that the other sentences of 40 to 50 years' imprisonment for each remaining count, to be served consecutively, are excessive, because such sentences are essentially another life sentence for Tolbert, who was a young man of 20 years of age when sentenced.

Tolbert's sentences, while at the high end of the statutory limits, are within those limits. We also note that under § 28-1205(3), Tolbert's sentences for use of a deadly weapon to commit a felony must be served consecutively to any other sentence imposed. Nor do we find the sentences to be excessive. Tolbert had a prior criminal history involving weapons. During the testing conducted at his presentence investigation, he scored as a high risk or very high risk in every category.

---

[7] *Id.*

[8] Neb. Rev. Stat. § 28-303 (Reissue 2008).

[9] Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012).

[10] Neb. Rev. Stat. § 28-308 (Cum. Supp. 2012).

[11] § 28-105.

[12] Neb. Rev. Stat. § 28-1205(1) (Cum. Supp. 2012).

[13] § 28-105.

Despite having three children, Tolbert has apparently never held a job or graduated from high school. He denies being in a gang, but acknowledges that many of his friends are in gangs. Tolbert freely admits to drinking alcohol, but denies using drugs.

The facts surrounding Tolbert's convictions are chilling. He was found guilty of one count of first degree murder and one count of first degree assault, as well as two counts of use of a deadly weapon to commit a felony. But Wilkinson could have just as easily been killed as injured in this incident.

Wilkinson and Wiseman were each approximately 16 years old. The group was shot at, and Wiseman killed, simply because they were wearing red clothing.

And even before Tolbert and his associates targeted Wiseman and his friends, Tolbert also attempted to shoot at two other individuals. It was pure luck that the safety of the shotgun was still on and that those people escaped unharmed.

We find nothing in this record to show that Tolbert has, at any point, expressed remorse over these shootings or the fact that a group of teenagers unrelated to any gang were shot at, with one killed and another injured. The record shows that the district court appropriately considered the relevant factors when it sentenced Tolbert as it did. Those sentences were not excessive, and Tolbert's assignment of error is without merit.

### Motion for New Trial

In his final assignment of error, Tolbert argues that the district court erred in denying his motion for new trial. Tolbert's motion was filed more than 10 days after the entry of the jury's verdicts, but was nevertheless timely because it alleged that a new trial was warranted on the basis of newly discovered evidence,[14] specifically, an affidavit from Cayou recanting his trial testimony.

In addition to Cayou's affidavit recanting his testimony, the district court was also presented with evidence that Cayou was threatened in order to obtain that recantation. In a second affidavit, Cayou averred that someone who identified himself as

---

[14] See Neb. Rev. Stat. §§ 29-2101(5) and 29-2103(4) (Reissue 2008).

Tolbert's cousin approached him and threatened to have Cayou "'jumped'" unless Cayou said that Tolbert was not the shooter. There was further evidence to show that the scenario as explained by Cayou was possible, given the housing arrangement at the Douglas County Correctional Center.

We review the denial of a motion for new trial for an abuse of discretion. The district court did not abuse its discretion in denying the motion for new trial in light of Cayou's second affidavit and explanation.

Tolbert's third assignment of error is without merit.

## CONCLUSION

The decision of the district court is affirmed.

AFFIRMED.

———————————

Barbara L. Potter, appellee, v. Patrick S. McCulla
and Hartford Underwriters Insurance Company,
appellees, and Tracy N. Garcia, D.D.S., L.L.C.,
and FirstComp Insurance Company, appellants.

___ N.W.2d ___

Filed August 1, 2014.    No. S-13-944.

1. **Workers' Compensation: Appeal and Error.** A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.

2. ____: ____. In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing; the findings of fact of the trial judge will not be disturbed on appeal unless clearly wrong.

3. **Workers' Compensation: Proof.** To recover under the Nebraska Workers' Compensation Act, a claimant must prove by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment caused an injury which resulted in disability compensable under the act.

4. **Workers' Compensation: Expert Witnesses.** Unless its nature and effect are plainly apparent, an injury is a subjective condition requiring an expert