STATE OF NEBRASKA, APPELLEE, V. BENJAMIN F. NEVELS,
APPELLANT.

453 N.W.2d 579

Filed April 6, 1990.   No. 89-698.

Dennis R. Keefe, Lancaster County Public Defender, and Scott P. Helvie for appellant.

Robert M. Spire, Attorney General, and Mark D. Starr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

In accordance with his pleas, defendant-appellant, Benjamin F. Nevels, who was 15 years of age at the time of the crimes, was adjudged guilty of manslaughter in violation of Neb. Rev. Stat. § 28-305 (Reissue 1989), robbery in violation of Neb. Rev. Stat. § 28-324 (Reissue 1989), and the use of a deadly weapon to commit a felony in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1989). He was thereafter sentenced to imprisonment for a period of from $6^2/3$ to 20 years for manslaughter, to a period of from 4 to 8 years for robbery, to be served concurrently with the manslaughter sentence, and to a period of from $5^1/3$ to 12 years for the use of a weapon, to be served consecutively to the other sentences. Nevels' assignments of error claim the district court erred in (1) failing to transfer his case to the juvenile court and (2) imposing excessive sentences with respect to the manslaughter and use of a weapon convictions. We affirm.

Nevels was born on July 17, 1973, to Fred and Paulette Nevels, who have since divorced. Nevels lives in Lincoln with his mother; his father lives in Alexandria, Virginia.

The divorce and her subsequent relationships with men were an emotional drain for Nevels' mother, who consequently was unable to provide a stable home environment for Nevels. Nevels witnessed the physical abuse of his mother during one of her relationships and was himself physically abused on at least two occasions. His mother changed residences frequently while Nevels was a child in order, according to her, to escape racial prejudice which arose as the result of her being white and Nevels' father being black.

Nevels had regular visits with his father prior to the time his father moved to Virginia, but after his father moved in 1981, the visits became less frequent. The unstable, unstructured, permissive environment created by Nevels' mother provided a confusing contrast to the more structured, regimented

environment provided by his father. In 1981, Nevels' mother married John Joseph, an inmate at the Nebraska State Penitentiary. Nevels often accompanied his mother on visits to the penitentiary to visit Joseph. According to one mental health expert, Nevels regards Joseph, rather than his natural father, as his true father.

Nevels began using alcohol and drugs at age 10 or 11 and has used them regularly since that time. He has also had difficulty in school, using disruptive behavior in order to get attention.

In addition, Nevels has a rather extensive history of adjudications in juvenile court, including adjudications for trespassing, resisting arrest, intentionally or recklessly causing damage to property, shoplifting, third degree assault, and receiving stolen property. He was placed on probation for all the adjudications except for the most recent incident involving property damage and receiving stolen property, for which he was committed to the custody of the Department of Correctional Services for placement in the Youth Development Center at Kearney, Nebraska. He violated the terms of his probations on a number of occasions.

Prior to Nevels' commitment to the Kearney center, Nevels' mother placed him in the Rivendell Center for Children and Youth, a privately operated psychiatric treatment facility at Seward, Nebraska, because of a suicide attempt made by Nevels. After 5 weeks at Rivendell, Nevels ran away. He was then placed in the Kearney center, from which he was eventually paroled. Nevels was not provided after his parole with any followup to the treatment he received at Kearney and committed the crimes which are the subject of the present action while on parole.

During the night of August 19, 1988, Nevels had been drinking alcohol and using drugs. Eventually, he encountered the victim, Eugene Nnakwe, and offered to help Nnakwe locate some marijuana. Nevels entered Nnakwe's vehicle, and the two contacted 17-year-old Jason Daniels, who also agreed to help Nnakwe find some marijuana and entered Nnakwe's vehicle. The three drove around Lincoln, searching for marijuana, and at some point while Nnakwe was out of hearing, Nevels and Daniels agreed that if they could not find Nnakwe any

marijuana, they would "beat him out of his money." According to Daniels, this expression refers to a nonviolent "con" whereby the two would tell Nnakwe they would use his money to buy marijuana, take his money under that pretext, and then not return with either the money or the marijuana.

Ultimately, at around 12:30 a.m. on August 20, the three arrived at a Lincoln, Nebraska, park so that Daniels could try to locate some marijuana at a nearby house. Nnakwe parked his vehicle on the street adjacent to the park. According to Nevels' testimony at the sentencing hearing, while Daniels was away from the vehicle, Nnakwe made sexual overtures toward Nevels, saying, "[Y]ou know what I want." When Daniels returned to the park, he heard Nevels say to Nnakwe, "You can't do that. Don't do that." According to Daniels, Nnakwe and Nevels were physically struggling with each other. Eventually, Nnakwe fell to the ground. When Daniels tried to break the two apart, Nnakwe grabbed him, whereupon Daniels struck Nnakwe on the chest.

Nnakwe then got up from the ground and ran toward the parked vehicle. When Daniels next saw Nnakwe and Nevels, they were again struggling. Nnakwe was on his knees, and Nevels was striking Nnakwe with his hands. Nnakwe fell onto his back, and Nevels began to kick Nnakwe's chest and head, using what Daniels described as "swoop kicks" and "stomp kicks." Even after Nnakwe became unconscious, Nevels continued to kick Nnakwe. According to Daniels, Nevels appeared "[u]pset and out of control, mad at something." Daniels dragged Nnakwe out from under Nevels' kicks, and the two dragged Nnakwe 35 or 40 feet to a tree further into the park.

Daniels urged Nevels, "Let's go, let's go," but Nevels remained in the park and began to strike Nnakwe in the chest and face with a metal tire iron, which, according to Nevels' testimony at the sentencing hearing, Nnakwe had earlier introduced into the altercation and had dropped. Daniels saw Nevels hit Nnakwe more than four times with the tire iron. According to Daniels, Nevels just kept repeating to Nnakwe angrily that "he couldn't do that. . . . [H]e couldn't do that." When Daniels told Nevels, "You are going to kill him," Nevels

stated, "I want to kill him. He can't do that." At Daniels' request, Nevels put the tire iron down, but then pulled a pine branch from a tree and began to strike Nnakwe with that.

After Nevels stopped beating Nnakwe, he went through Nnakwe's pockets and got the keys to his vehicle. He and Daniels then left the park in Nnakwe's vehicle, with Daniels driving. Nevels said to Daniels, "Did you know that guy was gay?" Daniels drove about half a block when Nevels told Daniels he wanted to return to the park to retrieve the tire iron. After retrieving the tire iron, Nevels returned to the vehicle and told Daniels that he had placed a picnic table on Nnakwe so he could not get away.

At the time they left the park, both Nevels and Daniels thought Nnakwe was "just knocked out" and were concerned he might get up and call the police about his stolen vehicle. They returned to the park to determine whether Nnakwe was still there. Daniels testified that he remained at the vehicle while Nevels went to check Nnakwe. Daniels stated he could hear Nnakwe making "a snoring sound" and heard Nnakwe "grunt." Nevels returned to the vehicle and told Daniels that Nnakwe was asleep.

The next morning, Nnakwe's body was discovered in the park. The physician who performed the autopsy stated that Nnakwe did not die from the blunt force trauma to his face and head but, instead, from asphyxiation over a period of 2 to 3 hours after the beating as a result of the aspiration and ingestion into his lungs of blood flowing from the wounds caused by the beating. This physician stated that at least six blows had been delivered to Nnakwe's head and neck.

After his arrest for the subject crimes, Nevels was placed in the Lancaster County juvenile detention center. On one occasion, Nevels was restricted to his room because of his involvement in a fight between two other residents of the center. As a result, Nevels became upset, agitated, and angry and attacked an employee of the center, hitting him 10 to 20 times. On at least two different occasions, Nevels threatened members of the staff. However, Nevels also received a letter of commendation for good behavior from several members of the staff.

Nevels was later admitted to Dominion Hospital, a psychiatric facility located in Virginia, for 4 weeks and then transferred to Springwood Psychiatric Institute, also in Virginia, an institution which deals specifically with substance abuse problems.

Several mental health experts testified on Nevels' behalf. Dr. Joseph Palombi, a child and adolescent psychiatrist, treated Nevels during his stay at Dominion Hospital. He opined that Nevels suffers from several disorders and disabilities, including a mixed developmental disorder involving several speech- and language-based learning disabilities; minimal cerebral dysfunction which interferes with Nevels' learning, cognition, motivation, interaction with other people, and memory; a "conduct disorder socialized aggressive," which means Nevels is aggressive during periods of anxiety and has difficulty in conforming his behavior to the norms of society; a major depressive disorder involving periods of depression and thoughts of suicide; a mixed substance abuse disorder involving the use of drugs to deal with sadness, depression, and low self-esteem; and an adolescent identity disorder which means Nevels is "still . . . in the process of forming his own identity, [is] very immature, presents with a very pseudo-mature, very macho, very self-confident image, [although] nothing could be further from the truth." Palombi estimated Nevels' level of maturity as that of an average 11- to 13-year-old juvenile. Palombi also testified that Nevels tries to act like an adult in order to create an identity for himself, but in reality does not take responsibility for his actions, is "very insecure . . . anxious . . . childlike," masks his emotions in order to protect himself, is "often . . . overwhelmed by anxiety," and will become assaultive if he feels threatened. According to Palombi, Nevels killed Nnakwe because he felt

> threatened by [Nnakwe], both physically and psychologically . . . the fact that a homosexual advance was made toward him and that physically an altercation occurred, [Nevels] clearly expressed his outrage and his fear that he was going to be both physically and sexually assaulted. . . . [T]he threat provoked a clear anxiety attack. . . . He lost control.

According to Palombi, Nevels responded favorably to the treatment he received in the Virginia institutions; developed a capacity to look at himself and express emotions about himself; began to feel good about academic accomplishments; had begun to think about his relationships with his mother, father, and stepfather; and was "beginning to feel some remorse" concerning Nnakwe's death. Palombi opined that Nevels' disorders are treatable as evidenced by his favorable response to treatment, that such treatment "could very definitely be" successful before Nevels reaches his 19th birthday and, in other words, that it was "well within the realm of our prognostic discussions . . . that [Nevels] could be treated within a three years plus time frame," and that the treatment Nevels requires could be provided by a long-term residential treatment facility having "controls and very rigid structure" with individualized programs. However, Palombi also acknowledged that neither he nor any other mental health professional could predict an individual's future dangerousness.

Palombi suggested placement of Nevels in The Pines treatment center, a partly secure private institution in Virginia. Palombi stated that while at Springwood, Nevels did better in a closed unit, one that is locked and provides a more strict, structured behavioral program, rather than an open unit. Palombi warned that mainstreaming Nevels into an adult prison population "would probably be [devastating]."

Another psychiatrist, Dr. Rosalyn Inniss, who interviewed Nevels for 7 1/2 hours and reviewed a multitude of records relating to Nevels, testified similarly to Palombi that Nevels has identity problems because of being biracial, suffers from depression, is relatively unattached to people, is immature, tries to get attention through negative behavior, and does not know what social behaviors are acceptable. According to Inniss, Nevels' identity problem is in part the result of his parents' differing lifestyles and in part the result of the fact that his mother has not required him to be or feel responsible for his behavior. Inniss viewed Nevels' participation in the attempt to trick Nnakwe out of his money as an effort by Nevels to become a full member of his peer group, and stated that Nevels perceived Nnakwe's sexual overtures as an attack upon his

masculinity, which devastated him.

Because Nevels seeks acceptance and nurturing, still perceives that there are alternatives to identifying with a group which displays negative conduct, and, in Inniss' view, showed progress while at Kearney and Rivendell, and because Nevels' judgment and abstract reasoning are still in the process of forming, Inniss was of the opinion that Nevels can be treated in "a highly structured treatment program" within the 3½ years until his 19th birthday. Inniss warned that sending Nevels to prison "would guarantee which way [Nevels would] go."

Dr. James Cole, a clinical psychologist, provided testimony similar to that given by Palombi and Inniss. Cole stated that Nevels' personality problems revolved around Nevels' lack of identity in that Nevels engages in negative behavior which makes him feel more secure about his black, male identity and which secures acceptance in his peer group. Cole also stated that because of the unstable, permissive home environment provided by his mother, Nevels is insecure and "less mature than a 15 year old." According to Cole, Nevels perceived Nnakwe's overtures as an immediate and sudden threat to his masculine identity, "which was his primary vulnerability," and as a result, "considerable anger was aroused against [Nnakwe], and then following anger would be aggression."

Cole was of the opinion that Nevels is treatable because he does not yet have a fixed personality, does not have the characteristics of the antisocial personality possessed by psychopaths and sociopaths, has a strong need for acceptance and to feel worthwhile, has the ability to feel affection for others, is responsive to attempts to establish a rapport with him, and has been amenable to treatment in the past. Cole expressed the view that "there's a very good chance" treatment in a healthy environment would be successful within the 3½ years until Nevels' 19th birthday. In his psychological assessment of Nevels, Cole recommended institutionalization for a minimum of 3 years. According to Cole, the failure to treat Nevels would result in his "becoming much more of a hardened, antisocial type." While Cole opined that Nevels could be treated in the high-risk offenders program of the Lincoln Regional Center, he also testified the center informed

him that because Nevels requires treatment for at least 3 years, it could not admit him because of lack of bed space.

During cross-examination by the State, Cole acknowledged that if Nevels were placed in the juvenile system, there would be a risk that he would believe he had manipulated the system. In his psychological assessment of Nevels, Cole recommended that "[w]hatever judicial, legal, or court proceedings occur, one core principle is critical: [Nevels] must be made to understand that he is responsible for his behavior. In a reasonable, age appropriate manner, he must bear the consequences of his actions. This must be clearly and unambiguously communicated to him."

The three mental health professionals who testified for Nevels were of the opinion that in treatment Nevels would benefit from interaction with his father, and Dr. Inniss further stated Nevels' mother should not be involved in such treatment. Just prior to the hearing on the motion to transfer, legal custody of Nevels was placed with his father, who expressed a willingness to participate in Nevels' treatment and to pay whatever expenses for treatment that were not covered by his insurance. He further testified that space for Nevels had already been reserved at the Dominion Hospital in Virginia. He did, however, acknowledge that Nevels would be in the facility on a voluntary basis.

Nevels also produced testimony concerning the treatment of juveniles placed with the Department of Correctional Services. Larry Tewes, the assistant director of the department, testified that no special programs are available to juveniles placed with the department. After the age of 16, juveniles are placed in the general adult population of the prison. Tewes testified that juveniles are vulnerable to the adult residents and that while a protective custody unit is available to residents, the protective unit does not eliminate the danger to juveniles. Tewes stated that the department provides voluntary inpatient treatment for social and mental impairments, mental illness, and substance abuse and employs three clinical psychologists who oversee the programs and provide direct treatment.

Nevels also produced the testimony of Dearle Alexander, a current resident of the Nebraska State Penitentiary who was

placed with the Department of Correctional Services at the age of 16. Alexander testified that drugs were readily available in prison and that he was regularly assaulted both sexually and physically. However, Alexander also stated that while in prison, he had passed a high school equivalency test, had gone to trade school, and had participated in Alcoholics Anonymous.

Several witnesses for the State, including Nevels' probation officer; Nevels' parole officer at the Kearney center; the Lancaster County Attorney, who investigated Nnakwe's death; and a psychologist for the Nebraska Department of Correctional Services, who had not worked with Nevels on an individual basis but had reviewed certain records concerning Nevels, opined that Nevels' case should not be transferred to juvenile court. These witnesses provided a variety of reasons for their opinions, including the violence and gravity of the offense committed, the lack of Nevels' success while in the juvenile court system, the inability of the juvenile court system to deal with a juvenile who has committed homicide, and the fact that dealing with Nevels in the juvenile court system might diminish the seriousness of the offense. The psychologist further expressed his view that mental health professionals cannot be certain that a juvenile who has been released is fully rehabilitated. Nevels' probation officer was of the opinion that Nevels required both punishment and rehabilitation in a very secure, long-term facility such as an adult correctional facility.

The State also produced several witnesses who testified concerning the inadequacy of the dispositions available to the juvenile court. Roy Nifoussi, Nevels' probation officer, testified that the possible dispositions of a juvenile through the juvenile court system included probation with the parent; probation in a foster home, group home, or some type of community correctional program; or placement at the Youth Development Center-Kearney. According to the Lancaster County Attorney, the Kearney center has no programs or methods available to deal with juveniles who have committed homicide.

Dr. Brad Bigelow, a psychologist for the Nebraska Department of Correctional Services, concurred that the Kearney center provided no specific programs for juveniles

who have committed homicide. Bigelow stated that juveniles may be released from the Kearney center at any time such dismissal is approved by the staff; the juvenile court has no control over when a juvenile is released. Bigelow also disclosed that "[n]umbers dictate [the] length of stay in our institution. And the more kids that we have coming in, obviously, the more kids we have to have going out." While Bigelow testified that he would not release a juvenile who had not fully benefited from the treatment program or would transfer the juvenile to a different program, he also stated that it was possible that a juvenile who had committed homicide could be released after 4 months if the juvenile displayed outstanding behavior. Bigelow described the Kearney center as an open campus, having no fence, guards, or guard dogs. "It's readily accessible to the community and vice-versa."

Nevels first asserts that the district court erred in concluding that there was a sound basis for retaining jurisdiction over him and thus erred in refusing to transfer his case to the juvenile court.

Neb. Rev. Stat. § 29-1816 (Reissue 1989) provides in relevant part that upon proper motion, the district court shall consider whether it should waive jurisdiction of one who was less than 18 years of age at the time the alleged crimes were committed and transfer the case to the juvenile court for proceedings under the Nebraska Juvenile Code.

In deciding whether to grant a requested waiver of jurisdiction and transfer proceedings to juvenile court, the court having jurisdiction over a pending criminal prosecution must carefully consider the juvenile's request in light of the criteria set forth in Neb. Rev. Stat. § 43-276 (Reissue 1988). *State v. Thieszen*, 232 Neb. 952, 442 N.W.2d 887 (1989); *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988); *State v. Ryan*, 226 Neb. 59, 409 N.W.2d 579 (1987); § 29-1816. Section 29-1816 provides that the district court shall transfer the case unless a sound basis exists for retaining it.

Section 43-276 requires consideration of the following criteria:

> (1) The type of treatment such juvenile would most likely be amenable to; (2) whether there is evidence that the

alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the juvenile and the ages and circumstances of any others involved in the offense; (5) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court, and, if so, whether such offenses were crimes against the person or relating to property, and other previous history of antisocial behavior, if any, including any patterns of physical violence; (6) the sophistication and maturity of the juvenile as determined by consideration of his or her home, school activities, emotional attitude and desire to be treated as an adult, pattern of living, and whether he or she has had previous contact with law enforcement agencies and courts and the nature thereof; (7) whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the juvenile; (8) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in custody or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; and (9) such other matters as [are deemed] relevant . . . .

In *State v. Alexander*, 215 Neb. 478, 486-87, 339 N.W.2d 297, 301-02 (1983), we stated:

There is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. For retention of the proceedings as a prosecution of a criminal offense, the court need not resolve every factor against the juvenile. Also, there are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified in the statute. [Citations omitted.]

The statutory criteria or factors of [§ 43-276] disclose a balancing test by which public protection and societal security are weighed against practical and not problematical rehabilitation of the juvenile. [Citations omitted.] "Rehabilitation has traditionally played a key

role in the treatment of young offenders. . . . Nevertheless, the concept of deterrence and the need to balance individual justice with the needs of society—a balancing process that is basic and fundamental to the general scheme of the criminal law—also have a place in the juvenile justice system." *State in the Interest of C.A.H. & B.A.R.*, [89 N.J. 326, 336, 446 A.2d 93, 98 (1982)]. As a result of such balancing, some youths will be held accountable through proceedings in the adult criminal justice system for effective deterrence of future antisocial misconduct.

. . . The probability of success and the duration of rehabilitative treatment must be considered in determining the manner and location of detention, that is, in the juvenile justice system or criminal justice system. [Citations omitted.]

Abuse of discretion is the standard of review applicable to an appeal from a district court's denial of a motion to transfer to juvenile court. *State v. Thieszen, supra.* While, as Nevels argues, there is testimony from three mental health professionals that he could be treated during the time the juvenile court would have jurisdiction over him (the juvenile court's jurisdiction over a juvenile lasts only until the juvenile attains the age of majority, age 19, or the court otherwise discharges the juvenile from its jurisdiction, see Neb. Rev. Stat. §§ 43-247 (Reissue 1988) and 43-245(6) and 43-289 (Cum. Supp. 1989)), there is also testimony that mental health professionals cannot be certain that a juvenile who has been released is fully rehabilitated. The district court was apparently not convinced that Nevels could be rehabilitated within the time the juvenile court would retain jurisdiction over him. As the trier of fact, the district court was not required to take the opinions of experts as binding upon it. See *Spangler v. State*, 233 Neb. 790, 448 N.W.2d 145 (1989).

The reality of the present case is that Nevels has repeatedly violated the law and performed other antisocial acts, culminating in the very violent and cruel beating which is involved in the present case. He has been subject to treatment, although limited, in the past and has as yet failed to reform. In

addition, there is evidence that if Nevels' case were to have been transferred to the juvenile court, he might have viewed the transfer as his manipulation of the system and not take responsibility for the crime. There is also evidence that the adult correctional facilities provide some rehabilitation programs if Nevels is willing to participate. The record supports the district court's findings that Nevels' rehabilitation needs will extend beyond the time the juvenile court has jurisdiction and that the facilities available to the juvenile court would not provide enough protection for the public.

The district court's conclusion that a sound basis exists for retaining jurisdiction over Nevels' case as a criminal prosecution is supported by appropriate evidence. Thus, in applying the balancing test of § 43-276, it cannot be said the district court abused its discretion in refusing to transfer Nevels' case to the juvenile court.

In view of the foregoing determination, we need not, and therefore do not, consider whether, in any event, Nevels' pleas of guilty to the charges waived any right he may have otherwise had to object to the district court's retention of jurisdiction over his case.

Nevels next asserts that the sentences imposed by the district court for manslaughter and use of a deadly weapon to commit a felony are excessive.

Neb. Rev. Stat. § 28-105 (Reissue 1985) provides that the penalty for manslaughter, a Class III felony, is a maximum of 20 years' imprisonment, a $25,000 fine, or both, and a minimum of 1 year's imprisonment. Like manslaughter, the crime of use of a deadly weapon to commit a felony is a Class III felony and commands the same penalty as manslaughter.

As frequently stated, a sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion by the sentencing judge. *State v. Nelson, ante* p. 15, 453 N.W.2d 454 (1990); *State v. Boppre,* 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Tyrrell,* 234 Neb. 901, 453 N.W.2d 104 (1990). In imposing a sentence, a sentencing judge should consider, among other things, the defendant's age, mentality, education, experience, and social and cultural background, as well as his past criminal record or

law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988). Moreover, it is the minimum portion of an indeterminate sentence which measures its severity. *State v. Sianouthai*, 225 Neb. 62, 402 N.W.2d 316 (1987).

Nevels asks us to consider, in determining whether the district court abused its discretion in imposing its sentences, Nevels' age, social history, learning disabilities, juvenile record, progress made in treatment and, according to the experts, the fact that he is salvageable, and that he complied with various treatment programs subsequent to committing the crimes here involved. While it is true that the district court is required to consider these factors, we have said that in addition to considering the defendant's age, we "are obliged to consider protection for the public and deterrence" of both the defendant and others similarly inclined. *State v. Alexander*, 215 Neb. 478, 487, 339 N.W.2d 297, 302 (1983). Considering the amount of violence involved in the beating of Nnakwe and Nevels' general antisocial personality, there was no abuse of discretion in the sentences imposed by the district court.

AFFIRMED.