IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


STATE V. BAZALDUA


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

ELIASIB R. BAZALDUA, APPELLANT.


Filed February 7, 2017.    No. A-16-422.


Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Joe Nigro, Lancaster County Public Defender, Kristi Egger Brown, and Haleigh Brockman, Senior Certified Law Student, for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.


INBODY and BISHOP, Judges, and MCCORMACK, Retired Justice.

BISHOP, Judge.

## I. INTRODUCTION

Eliasib R. Bazaldua pled "no contest" to one count of third degree sexual assault of a child, but chose to go to trial on one count of first degree sexual assault of a child. Following a jury trial, Bazaldua was convicted of first degree sexual assault of a child. Bazaldua challenges his conviction for first degree sexual assault of a child and his sentences. Additionally, he claims that his trial counsel was ineffective. For the following reasons, we affirm.

## II. BACKGROUND

U.M., born in June 2009, is the son of Edith M. In May 2015, U.M. told Edith that her live-in boyfriend, Bazaldua, had engaged in inappropriate sexual conduct with him. Law enforcement was contacted and U.M. was interviewed and physically examined at the Child

Advocacy Center. After Bazaldua was interviewed by an investigator with the Lincoln Police Department about the alleged conduct, he was arrested.

The State charged Bazaldua with two crimes: count 1, first degree sexual assault of a child, a Class IB felony, pursuant to Neb. Rev. Stat. § 28-319.01 (Reissue 2016); and count 2, third degree sexual assault of a child, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-320.01 (Reissue 2016).

Although there was no agreement or deal with the State, Bazaldua pled "no contest" to count 2, third degree sexual assault of a child. The district court accepted Bazaldua's plea and found him guilty of count 2. Therefore, the only issue at trial was count 1, first degree sexual assault of a child.

Prior to trial, there was a hearing to determine whether U.M., 6 years old at the time, knew the difference between the truth and a lie. Although some of U.M.'s answers were wrong (e.g. description of a particular person's hair, eye, and pant color), the district court determined the answers went to U.M.'s credibility but U.M. understood the distinction between telling the truth and telling a lie.

The trial was held in February 2016. The State called several witnesses and introduced numerous exhibits into evidence. Bazaldua did not testify. Evidence was presented that U.M. was born in June 2009, and that Bazaldua was 54 years old at the time of trial.

U.M. testified that he was 6 years old and in the first grade. He lived with his mother, Edith. Previously, Bazaldua lived with them as well. When his mother worked, U.M. would spend time alone with Bazaldua. Bazaldua touched U.M.'s "butt" and his "chicken" (U.M.'s word for penis). On cross-examination U.M. clarified that he actually calls his penis "pollo," but was asked to translate the word into English (there was no discussion about who asked U.M. to translate the word). (We will use "penis" throughout this opinion). U.M. described three incidents with Bazaldua, which we describe in no particular order. First, when his mother was at work, U.M. was in the kitchen with Bazaldua, who gave U.M. milk and bread. U.M. was sitting on the kitchen table (later clarified to be the kitchen counter) when Bazaldua put his mouth on U.M.'s penis and began "sucking it." Second, U.M. and Bazaldua were in Edith's bedroom and Bazaldua put his penis "inside" U.M.'s "butt." U.M. also touched Bazaldua's penis after Bazaldua told him to do so. When U.M. was touching Bazaldua's penis, Bazaldua told him to "go up, down, up, down." U.M. described Bazaldua's penis as "soft" and said it looked "big." Third, Bazaldua took U.M. to the place where "Latif" fixes cars. At Latif's, Bazaldua took U.M. to a room that smelled like "fish," took U.M.'s pants off, and touched U.M.'s "butt" with his penis. U.M. said Bazaldua put his penis "on" his (U.M.'s) "butt" and that it went inside. Besides the foregoing incidents, U.M. had seen Bazaldua naked going "pee" in the bathroom "because the door was open." U.M. told his mother after the first time something happened, but she did not do anything. After it happened again, U.M. told his mother and she called the police. On cross-examination, U.M. said that he did not cry during the second and third incidents above, and that neither incident hurt. Also during cross-examination, U.M. testified that "Jerrica" from the Child Advocacy Center and the prosecutor told him how to say certain things.

Edith testified that she first met Bazaldua in 2013 at his wedding. Sometime thereafter, Bazaldua moved in with Edith at an address on Nelson Street in Lincoln, Nebraska. At first,

Bazaldua was a "renter," but he and Edith eventually entered into an intimate relationship. In May 2015, Edith, U.M., and Bazaldua moved to a residence on "E" Street in Lincoln. While they were living together, Edith worked about four days a week at a hotel during which time Bazaldua would occasionally watch U.M. In May 2015, U.M. expressed concerns about his time alone with Bazaldua. U.M. appeared nervous and afraid. Edith then got cameras because she "wanted to get some kind of proof." Later, U.M. again expressed some concerns and Edith took him to one of her other children's homes and after talking to her daughter, they went back to Edith's home and called the police the next day, May 18. The police told her to take the necessary things from the house and leave, which Edith did.

Shortly after Edith reported the incident to the police, and at their request, she made four controlled calls to Bazaldua on May 20, 2015. During the phone calls, Edith informed Bazaldua of the accusations and he discouraged her from calling the police, taking U.M. to a psychologist, and talking to others about the accusations. While talking to Bazaldua, the police were passing Edith notes of questions to ask him. Investigators Herrera and Cockle were present when she made the phone calls, which occurred in Spanish.

Prior to the first controlled call, Edith called Bazaldua and told him she was mad at him because she had been told that he had been with another woman, and that was why Edith left the home and took some money from his lockbox. Then between the first and second controlled call, Edith again made another call to Bazaldua that was not recorded--she told him that U.M. claimed he had been improperly touched by Bazaldua and that she contacted the police. Bazaldua was adamant that he did not do anything.

Besides U.M., Edith has five older children. Maty M. is U.M.'s sister and Edith's daughter. She is a "CNA" and in the Army Reserves. Maty testified that she called 9-1-1 in May 2015 at her mother's request; it was a drill weekend, so either on a Saturday or Sunday. Evidence presented at trial showed that Edith's older children did not like Bazaldua. However, Maty testified that she never told U.M. to accuse Bazaldua of sexual assault and never told U.M. what to say regarding this case.

Troy Cockle, an investigator with the Lincoln Police Department, works for the family crimes unit within the department's criminal division. Cockle was assigned to this case on May 18, 2015. He contacted Edith and made arrangements with her to have U.M. interviewed at the Child Advocacy Center. The interview occurred on May 19.

Michelle Halim is a forensic interviewer at the Lincoln/Lancaster County Child Advocacy Center. Halim testified that a forensic interview is a "neutral nonbiased conversation with a child intended to elicit detail and information on events that may or may not have occurred." She was trained to use a continuum of questions during a forensic interview, which starts from the most open-ended questions to more direct questions. She was trained not to use leading questions so the child has the opportunity to discuss any events in their own words and "not put any ideas into their head." Halim conducted a forensic interview of U.M. in May 2015, and followed all proper protocols during the interview.

Dr. Stacie Bleicher is a general pediatrician in a full-time practice and also serves as the medical director at the Lincoln Child Advocacy Center. She has training specific to child sexual abuse. Dr. Bleicher testified that she performed a medical examination on U.M. on May 21, 2015.

U.M. had a normal examination on that day, there were no injuries to his genital or anal areas. The fact that the anus was normal does not mean that U.M. was not subjected to sexual penetration. According to Dr. Bleicher, "[t]he tissue around the anus is made to be expandable." She said that there have been studies undertaken by child abuse specialists that have found that when children are seen at a time somewhat removed from alleged assaults, "95 percent of the time their exams are totally normal and it is far less usual to find any abnormalities in the anal area. It is not tissue that tends to scar or show prior injuries very well unless they've had a severe penetrating injury that has actually torn through the muscles around the anus. Those are very unusual." Outside of 48 hours, you would not expect to see any injuries as they would have healed.

Investigator Cockle testified that on May 20, 2015, he met with Edith at the Child Advocacy Center, obtained a statement from her, and then had her make controlled calls to Bazaldua. In Cockle's experience, when either the victim or the victim's guardian calls the alleged perpetrator to confront them, a lot of times the alleged perpetrator will make free admissions and apologies; law enforcement is also able to ascertain the demeanor of the alleged perpetrator and the validity of the initial investigation. In this case, Cockle used Investigator Herrera to translate the questions and statements that Cockle wanted Edith to make during the controlled call to Bazaldua. Two calls were made on the morning of May 20, and two calls were made that afternoon. Cockle was present for the morning calls, but was not present in the afternoon (he had given Edith a digital recorder to record those conversations by herself).

Cockle first met with Bazaldua on May 21, 2015, for 15 to 20 minutes at an apartment on "E" Street. Cockle identified himself and informed Bazaldua that part of his duties were to follow up on cases where children are missing or they do not show up from school. Cockle told Bazaldua that U.M. had been pulled from school and that there was not a good explanation for it. (Cockle said when people are accused of sexual abuse directly, sometimes they will leave the jurisdiction, or harm themselves or others. He did not want to conduct an arrest at that stage, but wanted to make sure that Bazaldua knew there was an investigation.) Accordingly, Cockle met Bazaldua under the pretext that U.M. was truant from school. During that initial interview, Bazaldua corroborated the fact that he had been alone with U.M. for a period of time, including on Saturday, May 16. According to Cockle, Bazaldua was not under arrest on May 21 and he spoke freely, voluntarily, and intelligently.

Cockle then called Bazaldua on May 26, 2015, and asked him if he would be willing to go to police headquarters and give a formal statement in regards to the investigation (i.e. U.M.'s truancy). Bazaldua was working and could not go in on that day, but later called Cockle and made arrangements to go the morning of May 27. Bazaldua did appear at headquarters on May 27, and after Cockle advised him of his *Miranda* rights, he agreed to speak with Cockle. At the time he signed the *Miranda* waiver form, Bazaldua had not been informed that he was a suspect in a possible sexual assault case. The recorded interview lasted three hours. A DVD copy of the interview was received into evidence as exhibit 24 over Bazaldua's objections--hearsay, confrontation, and Neb. Rev. Stat. §§ 27-404 (prior bad acts), 27-414 (evidence of similar crimes in sexual assault cases), 27-403 (unfair prejudice), and 27-104 (admissibility) (Reissue 2016)--and the exhibit was played for the jury.

As evidenced by exhibit 24, during the interview with Cockle, Bazaldua said that while he and U.M. were in the kitchen on Saturday, one day before Edith left the home, U.M. spilled milk on himself while wearing only underwear. When Bazaldua was cleaning U.M., U.M. got an erection. Bazaldua tried to explain to U.M. that was normal, and then showed U.M. how to masturbate (on U.M.'s body). Bazaldua told Cockle that he was only teaching U.M., trying to guide him in the right way, and that there was no sexual intent. Bazaldua claimed that the Saturday incident was the only such incident that occurred between him and U.M. He affirmatively denied that any other incidents occurred, said he never penetrated U.M. with his penis, and denied ever putting his penis on U.M. However, Cockle testified generally that during interviews, people are not always honest and that sometimes they "minimize."

After the interview with Bazaldua, Cockle conducted a search of the "E" Street residence on May 27, 2015. Cockle seized a brown towel that U.M. described as being something that potentially was used to wipe up some bodily fluid, and some bed sheeting. Cockle did not expect to obtain anything useful because the towel looked like it had been washed, and he knew that Bazaldua and Edith had had sexual intercourse on the bedding. (It does not appear that any DNA analysis was ever done in this case.)

The jury found Bazaldua guilty of first degree sexual assault of a child, and the district court entered judgment based on the jury's verdict. The district court thereafter sentenced him to imprisonment for 30 to 60 years for first degree sexual assault of a child (count 1), and 4 to 5 years for third degree sexual assault of a child (count 2). The sentences were ordered to be served concurrently with each other. Bazaldua was given credit for 307 days' time served. He now appeals.

## III. ASSIGNMENTS OF ERROR

Restated, Bazaldua assigns: (1) the guilty verdict at trial was not supported by sufficient admissible evidence; (2) the district court imposed an excessive sentence; and (3) his counsel was ineffective.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

The resolution of an ineffective assistance of counsel claim made on direct appeal turns on the sufficiency of the record. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Bazaldua argues that there was not sufficient admissible evidence to convict him of first degree sexual assault of a child pursuant to § 28-319.01. His claim is essentially that U.M.'s testimony was the only substantive evidence of the crime, and that U.M. was not a credible witness and had ideas suggested to him. However, in reviewing a criminal conviction for a sufficiency of the evidence claim, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones, supra*. See, also, *State v. Rodriguez*, 244 Neb. 707, 509 N.W.2d 1 (1993) (coaching is a matter which bears upon a witness' credibility and the question of coaching is one for the jury).

Pursuant to § 28-319.01(1), a person commits sexual assault of a child in the first degree:

(a) When he or she subjects another person under twelve years of age to sexual penetration and the actor is at least nineteen years of age or older; or

(b) When he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older.

Neb. Rev. Stat. § 28-318(6) (Reissue 2016) defines "sexual penetration" as:

sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. . . .

During his testimony, U.M. described three incidents with Bazaldua, any one of which qualifies as sexual penetration pursuant to § 28-318(6). We address the incidents in no particular order. First, when his mother was at work, U.M. was in the kitchen with Bazaldua, when Bazaldua put his mouth on U.M.'s penis and began "sucking it." Fellatio qualifies as "sexual penetration" pursuant to § 28-318(6).

Second, U.M. said that when he and Bazaldua were in Edith's bedroom, Bazaldua put his penis "inside" his (U.M.'s) "butt." Third, U.M. said that while at Latif's place, Bazaldua took U.M.'s pants off, and touched U.M.'s "butt" with his penis; U.M. said Bazaldua put his penis "on" his (U.M.'s) "butt" and that it went inside. Because any intrusion, however slight, of any part of the actor's body into the genital or anal openings of the victim's body counts, both of these instances qualify as "sexual penetration" pursuant to § 28-318(6).

The testimony at trial revealed that U.M. was born in June 2009, and that Bazaldua was 54 years old. Accordingly, U.M. was under 12 years of age and Bazaldua was at least 19 years of age or older at the time the offense was committed. Viewing the evidence in the light most favorable

to the State, there was sufficient evidence to convict Bazaldua of first degree sexual assault of a child.

We note that Bazaldua challenges the timing of the incidents, arguing "no evidence was presented that could allow a rational jury to find beyond a reasonable doubt that [Bazaldua] subjected U.M. to penetration on, about, or between October 1, 2014, and May 17, 2015," which were the dates alleged in the information. Brief for appellant at 25. Our response is two-fold. First, in *State v. Samayoa*, 292 Neb. 334, 343, 873 N.W.2d 449, 456 (2015), the Nebraska Supreme Court held:

> In the case of sexual assault of a child, the statutes involved do not make the time or date of the offense an element of the crime. Sections 28-319.01(1) and 28-320.01 require proof that the sexual penetration or sexual contact occurred when the defendant and victim were certain ages. But they do not require proof that such event occurred on a specific date. We therefore conclude that the exact date of commission is not a substantive element of first, second, or third degree sexual assault of a child.

Second, there was in fact evidence regarding the timeframe of the first and second incidents. U.M. testified that both incidents occurred in their home, and identified the rooms in which they occurred via pictures received into evidence. The pictures were taken at their residence on "E" Street, and Edith testified they moved to "E" Street in May 2015. Finally, Edith testified that U.M. first expressed concerns to her in May, and after he expressed concerns again, she called the police "the next day." Cockle was assigned to the case on May 18. Accordingly, even though timing was not an element of the offense, it was established for two of the incidents.

## 2. EXCESSIVE SENTENCE

Bazaldua asserts that the district court imposed an excessive sentence. When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

Bazaldua was 54 years old at the time of sentencing. He has been married since 2013 (but not to Edith), and has one child with his wife. Bazaldua had completed his GED and some college. He was unemployed due to his incarceration, but prior to his arrest was a self-employed handyman. Bazaldua is an illegal alien from Mexico.

Bazaldua's criminal history consists of convictions for third degree assault and criminal trespass. He has also been fined for speeding (five times), no proof of insurance, no operator's license on person, and urinating in public. As to his current offenses, he sexually assaulted a 5-year-old boy. As part of the presentence investigation for his current convictions, the probation office conducted a Level of Service/Case Management Inventory, which assessed Bazaldua in the medium-low risk category for recidivism. Bazaldua also completed the Vermont Assessment for Sex Offender Risk (VASOR), which is composed or two scales, a re-offense risk scale and a violence scale. On the VASOR, Bazaldua placed in the moderate-low risk range overall.

Bazaldua argues that the district court should have given him the minimum sentence required under the law. He argues that the court failed to consider his low risk to reoffend. Furthermore, both at the sentencing hearing and in his brief, Bazaldua said that he faces deportation once he finishes serving his sentence and that "we [should] not waste the monies of the people of the state of Nebraska on individuals such as Mr. Bazaldua by giving them sentences that are longer than necessary to protect the public." The State does not believe that Bazaldua's immigration status is something that should be considered. Rather, the State asked the court to take into consideration that Bazaldua abused his position of trust and power over U.M. by committing these assaults. The State further points out that even though Bazaldua previously admitted to sexual contact with U.M., during his PSI he denied any criminal activity or that he had "crossed the line" with his behavior. The district court said it reviewed the PSI and the appropriate statutory factors in determining the sentence, and found that imprisonment was necessary "because the risk is substantial that during any period of probation [Bazaldua] would engage in additional criminal conduct and because a lesser sentence would depreciate the seriousness of his crimes and promote disrespect for the law."

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Dixon, supra*. And it is the minimum portion of an indeterminate sentence which measures its severity. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

Sexual assault of a child in the first degree is a Class IB felony with a mandatory minimum sentence of 15 years in prison, for the first offense, and up to life in prison. § 28-319.01(2); Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Bazaldua was sentenced to 30 to 60 years' imprisonment for first degree sexual assault of a child (count 1). At the time of Bazaldua's offenses, third degree sexual assault of a child was a Class IIIA felony for the first offense and punishable by and up to 5 years' imprisonment, a $10,000 fine, or both. § 28-320.01(3); § 28-105. Bazaldua was sentenced to 4 to 5 years' imprisonment for third degree sexual assault of a child (count 2). And counts 1 and 2 were ordered to be served concurrently. (We note that Bazaldua's offenses occurred prior to August 30, 2015, the effective date of 2015 Neb. Laws, L.B. 605, which changed the classification of certain crimes and made certain amendments to Nebraska's sentencing laws.) Having considered the relevant factors in this case, we find that the sentences are not excessive or an abuse of discretion and such sentences are therefore affirmed.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015). To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013). When a conviction is based upon a guilty plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading

guilty. *State v. Armendariz*, 289 Neb. 896, 857 N.W.2d 775 (2015). An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. *State v. Newman, supra*.

Bazaldua obtained new counsel for this direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Newman, supra*. Otherwise, the issue will be procedurally barred. *Id*. However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id*.

Bazaldua argues that his trial counsel was ineffective because counsel (1) pressured him into entering a plea to count 2, and (2) failed to renew his objections made prior to opening statements regarding the admissibility of evidence as to count 2 when the court had not previously made a final ruling on the issue.

### (a) Plea to Count 2

Bazaldua argues that he was pressured by counsel into entering a plea to count 2, third degree sexual assault of a child. There was no agreement or deal made with the State in exchange for Bazaldua's "no contest" plea to count 2. At the plea hearing, the court asked Bazaldua if he was waiving his rights freely and voluntarily. Bazaldua asked if he could speak with counsel before answering and was allowed to do so. After an off-the-record discussion with counsel, Bazaldua told the court he was waiving his rights freely and voluntarily. After a factual basis was given by the State, and an alternative basis was given by defense counsel, the court asked Bazaldua if he still wished to plead no contest to count 2, and Bazaldua said "yes." In his brief, Bazaldua argues that "it should not be presumed that he entered his plea intelligently as he was pressured by his counsel into entering the plea during an off the record discussion." Brief for appellant at 34. He claims that trial counsel told him to enter the plea saying "I want to make them mad. Apparently, this is because . . . trial counsel believed if [Bazaldua] entered this plea, no facts relating to [Bazaldua] and U.M. in the kitchen would be allowed to come up in trial." *Id*. at 33. However, Bazaldua "concedes that trial counsel's reasons for pressuring him to enter a plea are unknown to him and are not ascertainable from the record." *Id*. at 34. Because this claim of ineffective assistance of counsel implicates matters of trial strategy, and potentially implicates privileged communications between Bazaldua and his trial counsel, an evidentiary hearing is required and the claim cannot be determined on the record before us.

### (b) Renewing Objections

Bazaldua argues that trial counsel was ineffective when counsel failed to renew objections made prior to opening statements regarding the admissibility of evidence as to count 2. Prior to trial, Bazaldua's counsel made a motion in limine regarding specific statements made by Bazaldua in the taped police interview, wherein he admitted touching U.M.'s penis while showing him how to masturbate (an incident that occurred in the kitchen). This admission formed the basis for

count 2 of the Information, to which Bazaldua pled "no contest." In the motion in limine, trial counsel asked that the court not allow the State to mention the admission during trial based on §§ 27-404, 27-414, 27-403, and 27-104. The State argued that Bazaldua's interview statements regarding the incident of sexual contact should be allowed because the event was "inextricably intertwined" in the case, and was part of the State's "story." The court sustained the motion in limine to the extent that the State was not to make reference to Bazaldua's admissions in its opening statement. However, the court said that "as the evidence occurs, I will make a decision as to whether the evidence is admissible under the relevant statues and case law."

In his brief on appeal, Bazaldua argues that "when U.M. was testifying at trial, . . . trial counsel failed to timely object to testimony regarding count 2 being received." Brief for appellant at 35. Bazaldua's argument is misplaced, because the motion in limine only went toward his statements (or confession) to the sexual contact in the kitchen. And trial counsel did renew his objections before the videotaped interview of the confession was played for the jury. The district court overruled the objections and allowed the tape to be played for the jury; Bazaldua has not challenged the court's ruling on the admissibility of the exhibit on appeal.

U.M.'s testimony that Bazaldua performed fellatio on him in the kitchen and put his penis inside U.M.'s "butt" while in Edith's bedroom and at "Latif's" was direct evidence of first degree sexual assault of a child, the crime at issue during the trial. At no time was such testimony argued to be inadmissible in light of the plea, nor was U.M.'s testimony covered by the motion in limine. At oral argument, Bazaldua's appellate counsel admitted that Bazaldua's brief had incorrectly talked about trying to keep statements out during the victim's testimony. In any event, we find there would have been no reason for trial counsel to renew the motion in limine before U.M.'s testimony. Defense counsel is not ineffective for failing to raise an argument that has no merit. *State v. Young*, 279 Neb. 602, 780 N.W.2d 28 (2010); *State v. Meduna*, 18 Neb. App. 818, 794 N.W.2d 160 (2011).

## VI. CONCLUSION

For the reasons stated above, we affirm Bazaldua's convictions and sentences. We further find that the record before us is insufficient to address, on direct appeal, Bazaldua's claim that his trial counsel pressured him into entering a plea to count 2, and was thus ineffective.

AFFIRMED.